# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Stephenson*, 2011 IL App (2d) 101214

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ALICIA STEPHENSON, Petitioner and Counterrespondent-Appellant, and RICHARD STEPHENSON, Respondent and Counterpetitioner-Appellee. |
| District & No. | Second District<br>Docket No. 2-10-1214 |
| Filed | August 12, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court abused its discretion in granting respondent's petition to disqualify petitioner's attorney on the ground that his representation of petitioner violated the Illinois Rules of Professional Conduct due to a conflict of interest, even though her counsel was in the same firm as the husband of respondent's counsel, since respondent failed to establish a former attorney-client relationship between himself and petitioner's counsel, there was no evidence petitioner's counsel acquired confidential information from the purported relationship with respondent, and respondent failed to establish that their former and subsequent relationships were substantially related. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 09-DV-851; the Hon. Gerald M. Zopp, Jr., Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Jennifer J. Gibson, of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, for appellant. |
| --- | --- |
| | Paulette M. Gray, of Law Offices of Paulette M. Gray LLC, of Crystal Lake, for appellee. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion. Justices Bowman and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    In this interlocutory appeal, petitioner and counterrespondent, Alicia Stephenson, argues that the trial court erred by granting the motion to disqualify her attorney, Mark Gummerson, filed by her husband, respondent and counterpetitioner, Richard Stephenson. Alicia argues that the trial court misinterpreted and misapplied Rules 1.7, 1.9 and 1.10 of the Illinois Rules of Professional Conduct (Ill. Rs. Prof'l Conduct Rs. 1.7, 1.9, 1.10 (eff. Jan. 1, 2010)). We reverse and remand.

¶ 2                                     I. BACKGROUND

¶ 3    In September 2009 Alicia filed a petition for dissolution of her marriage to Richard. Alicia's petition was signed by attorney Elizabeth Felt Wakeman of Zukowski, Rogers, Flood & McArdle. Richard filed a counterpetition for dissolution of marriage in December 2009. In September 2010 Richard retained attorney Paulette Gray. Paulette was married to attorney Robert Gray, a partner in Gummerson's law firm, Gummerson Rausch Wand Gray and Wombacher, LLC. On October 26, 2010, Gummerson filed an appearance as additional counsel on behalf of Alicia. Richard objected to Gummerson's appearance and filed a motion to disqualify Gummerson on October 28, 2010.

¶ 4    Richard's motion alleged that Gummerson's representation of Alicia violated Rules 1.7, 1.9, and 1.10. More specifically, Richard alleged the following. Paulette and Robert "had ongoing substantive and strategy discussions" about issues concerning the parties' dissolution case. Paulette and Robert discussed the parties' assets, their prenuptial agreement, child support, privileged information regarding Richard's wealth and financial holdings, and Alicia's pending petition for interim attorney fees. Due to these conversations, Robert would be prohibited from representing Alicia due to a concurrent conflict of interest pursuant to Rule 1.7 or 1.9, because Robert had a duty to Richard as his former client. Because Robert could not represent Alicia, none of the lawyers in Robert's firm, including Gummerson, could represent her, pursuant to Rule 1.10. Further, Richard did not and would not consent to a waiver under Rule 1.7, 1.9, or 1.10.

¶ 5    In addition, Richard's motion alleged that, before Gummerson filed his appearance on Alicia's behalf, "Paulette had a substantive discussion with" Gummerson "regarding strategy in this case." The discussion was about a motion Richard filed against Wakeman, one of Alicia's attorneys. Because of this discussion, Gummerson had a duty to Richard "akin" to that owed to a former client.

¶ 6    At the hearing on the motion to disqualify, Paulette testified that on September 29, 2010, she had a conversation with Robert about the interim fee petition filed by Wakeman, and the contents of the documents attached to the petition. They also discussed the strategy to be used in responding to the petition. Paulette gave Robert information about the circumstances surrounding the parties' signatures on their prenuptial agreement. They discussed whether Alicia would be able to contest the validity of the prenuptial agreement. Paulette and Robert also discussed "any house" Richard "may have to purchase for Alicia," and "potential maintenance" based on Richard's income "relative to the time frames contained" in the prenuptial agreement.

¶ 7    Paulette also testified that, on September 30, 2010, she told Robert, "Put your thinking cap on. Put your lawyer hat on. I don't want you to be my husband right now." Paulette and Robert then discussed strategy regarding Alicia's petitions for interim attorney fees previously filed by Wakeman's firm; they specifically discussed how Richard could use those petitions to his benefit and how he should respond to the most recently filed petition. Paulette and Robert discussed whether Paulette should file a motion for sanctions against Wakeman's firm, because Paulette's name would be on the motion and she did not want to burn a "bridge with Mr. Flood," Wakeman's partner. Paulette told Robert that she was thinking about asking Gummerson for his advice about the matter.

¶ 8    During cross-examination, Alicia's counsel asked Paulette, "When did [Richard] authorize you to engage [Robert]?" The trial court sustained Richard's counsel's objection based on attorney-client privilege. The following colloquy occurred:

"Q. Is it your position that [Richard] is [Robert's] client?

A. Yes.

Q. And did [Richard] pay [Robert] a retainer, if you know?

A. I don't know.

Q. Did he sign a retainer agreement with [Robert]?

A. I don't know."

¶ 9    Paulette also testified that between September 29 and October 5, 2010, Paulette had a five-minute conversation with Gummerson in the hallway of the McHenry County courthouse. Paulette identified the issue as the "Stephenson matter" and told Gummerson that she represented the husband. Paulette told Gummerson that Wakeman had filed a petition for interim fees. Attached to the petition was Richard's personal financial statement, including "an itemization of accounts, account numbers, account balances, what jewels [Richard and Alicia] had, what furs they have, what [Richard's] financial situation is." Paulette never showed Gummerson any documents. Paulette asked for Gummerson's advice about whether she should sign and file a motion for sanctions against Wakeman and asked, "would there be a potential problem for me signing it in terms of me practicing in this

county?" Paulette told Gummerson that she was concerned about "pissing off" Flood. Gummerson replied that there would not be a problem. Paulette testified that she did not, at any time, tell Gummerson that she consulted with Robert about the issues. Paulette testified that she never hired Gummerson and did not talk to Gummerson about the case again.

¶ 10    Gummerson testified that the courthouse conversation with Paulette occurred sometime in early October. The meeting lasted only two to three minutes and other people were present; there was no privacy. Gummerson's testimony regarding the conversation differed from Paulette's in that Gummerson testified that she did not mention the parties' names but mentioned that the case involved the Cancer Treatment Centers of America and a substantial amount of money and that she represented the husband. The remainder of Gummerson's testimony regarding the content of the conversation was essentially the same as Paulette's testimony.

¶ 11    Gummerson testified that 5 to 7 days, or up to 10 days, after he spoke with Paulette at the courthouse, Flood asked Gummerson if he would be interested in representing Alicia. At that time, Gummerson knew that Paulette was involved in the case, based on their conversation at the courthouse. Subsequently, Gummerson spoke to Robert about the case. Gummerson told Robert that he "needed to make sure that we established a 'Chinese wall.' " Gummerson told Robert that he "did not want [Robert] to be participating, to have any involvement whatsoever. Have no discussions. That he would be kept out completely of the file." Robert agreed. In addition, on the day Gummerson filed his appearance on behalf of Alicia, but before he filed it, he told Robert that he was going to do so and "reiterated [that Robert] needed to stay away from the case, stay out of it." Gummerson testified that he had no other conversations with Robert about the case. Gummerson testified that Alicia signed a retainer agreement on October 25, 2010.

¶ 12    Gummerson testified that his firm had a client intake process whereby, when anyone met with a potential client, a file was opened and a conflicts check was performed to determine if representation would pose a conflict of interest. Gummerson reviewed every new file on a weekly basis. Due to this procedure, Gummerson would know if Robert had accepted Richard as a client. Gummerson testified that Richard was not, and had never been, a client of his firm and had never signed a retainer agreement with his firm or paid Gummerson any money.

¶ 13    Gummerson testified that, in his effort to maintain the "Chinese wall" after he was retained by Alicia, he sent out a memo to his staff, partners, and associates and advised them that he could not "use" Robert because he had established a "Chinese wall" regarding him. Gummerson made sure that they understood the concept of the "Chinese wall": that Robert could not be involved in the case and that they could not have any discussions with Robert about the case. Gummerson also sent a memo to Robert to reiterate and reinforce the "Chinese wall." Further, the Stephenson file was segregated in Gummerson's office and was not placed into the firm's general filing system. Gummerson instructed his paralegal and secretary that no one was to have access to the Stephenson file other than attorneys Wombacher and Lee, who were working with Gummerson, and that the file must always be returned to Gummerson's office. Gummerson made sure that Wombacher and Lee understood the concept of the "Chinese wall." Gummerson also spoke with them to make

sure that no one discussed the case in Robert's presence.

¶ 14 Robert testified that he and Paulette discussed the Stephenson case daily. They discussed Alicia's financial affidavit, the manner in which Richard would attack it, the parties' prenuptial agreement, and strategy regarding the preparation of Richard's financial affidavit. Robert never saw the prenuptial agreement or the financial affidavits of either party. He never met Richard, spoke to him, or asked him to sign a retainer agreement. Richard never gave Robert money. Robert did not enter Richard on his firm's "client's conflicts database." Robert testified that he could not represent Alicia because of "the obvious conflict of–that I believe exists having a case against your wife, the spouse" and because he had been told "things that in my good conscience I feel would affect my representation [of Alicia]." Robert testified that he never discussed the case with Gummerson.

¶ 15 After hearing arguments, the trial court made the following findings. Richard did not retain Robert or Gummerson. During the conversations between Paulette and Robert "it would appear that confidential information was at least passed from [Paulette] to [Robert]." Gummerson's screening process was "too late" because it began after Gummerson spoke with Paulette and after Paulette and Robert had talked about the case. Further, the trial court stated, "This case is tainted right now." The trial court granted the motion to disqualify Gummerson.

¶ 16 Alicia timely appealed.

¶ 17                                    II. ANALYSIS

¶ 18 The parties agree on the applicable law; Rules 1.7, 1.9, and 1.10 of the Illinois Rules of Professional Conduct. On appeal, Alicia argues that the trial court erred by disqualifying Gummerson, essentially because Richard failed to establish that Gummerson's representation of Alicia violated these rules.

¶ 19 When determining whether to grant or deny a motion to disqualify an attorney, a trial court must consider that "[a]ttorney disqualification is a drastic measure because it destroys the attorney-client relationship by prohibiting a party from representation by counsel of his or her choosing." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 178 (1997). Therefore, a trial court should grant a motion to disqualify an attorney only when absolutely necessary. *In re Estate of Klehm*, 363 Ill. App. 3d 373, 377 (2006). In addition, the party seeking disqualification carries a heavy burden to prove that his motion for disqualification is not being brought as a tactical weapon to gain undue advantage in the litigation. *SK Handtool Corp. v. Dresser Industries, Inc.*, 246 Ill. App. 3d 979, 989 (1993).

¶ 20 A trial court's decision to grant a motion to disqualify an attorney will not be disturbed absent an abuse of discretion. *Schwartz*, 177 Ill. 2d at 176; *Macknin v. Macknin*, 404 Ill. App. 3d 520, 530 (2010). "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *Schwartz*, 177 Ill. 2d at 176.

¶ 21 Alicia contends that the proper standard of review is *de novo* because the essential facts are not in dispute. However, Alicia fails to recognize that essential facts are in dispute including whether Paulette had the authority as Richard's agent to seek counsel from and disclose confidential information to Robert. See *Amcore Bank, N.A. v. Hahnaman-Albrecht,*

*Inc.*, 326 Ill. App. 3d 126, 134 (2001) (the scope of an agent's authority is a question of fact).

¶ 22    Alicia cites *Macknin*, 404 Ill. App. 3d 520, to support her contention that a *de novo* standard of review applies. Alicia's reliance on *Macknin* is misplaced because, in *Macknin*, we determined that the trial court's decision to grant a motion to disqualify an attorney was an abuse of discretion. *Macknin*, 404 Ill. App. 3d at 533. Thus, *Macknin* does not support Alicia's contention that we must apply a *de novo* standard of review to the trial court's ultimate decision. We note that, in *Macknin*, we applied a *de novo* standard of review to the interpretation of the supreme court rule at issue (*Macknin*, 404 Ill. App. 3d at 530-31), and we will do the same in this case. We now discuss the rules of professional conduct at issue.

¶ 23    Rule 1.7 of the Illinois Rules of Professional Conduct provides:

"(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent." Ill. Rs. Prof'l Conduct R. 1.7 (eff. Jan. 1, 2010).

¶ 24    Rule 1.9 of the Illinois Rules of Professional Conduct provides:

"(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

-6-

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client." Ill. Rs. Prof'l Conduct R. 1.9 (eff. Jan. 1, 2010).

¶ 25 Rule 1.10 of the Illinois Rules of Professional Conduct provides in pertinent part:

"(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." Ill. Rs. Prof'l Conduct R. 1.10 (eff. Jan. 1, 2010).

¶ 26 We interpret the Illinois Rules of Professional Conduct in the same manner as statutes. See *Macknin*, 404 Ill. App. 3d at 530. We ascertain and give effect to the intent of the drafter, using the plain and ordinary language of the rule. See *People v. Calabrese*, 398 Ill. App. 3d 98, 120 (2010). Thus, when the language of the rule is clear, we must apply it as written without resort to aids or tools of interpretation. *Skarin Custom Homes, Inc. v. Ross*, 388 Ill. App. 3d 739, 743 (2009). The construction of the Illinois Rules of Professional Conduct is a question of law, to which we apply *de novo* review. *Macknin*, 404 Ill. App. 3d at 530-31.

¶ 27                              A. Paulette's and Robert's Discussions

¶ 28                                   1. Client Relationship

¶ 29 Alicia argues that any application by the trial court of Rules 1.7 and 1.10 to disqualify Gummerson was erroneous because Richard was not a client of Robert's. Conversely, Richard argues that, pursuant to Rule 1.7, Robert was Richard's *de facto* attorney and could not represent Alicia. Richard further argues that, pursuant to Rule 1.10, Robert's representation of Richard was imputed to the entire firm, including Gummerson, and therefore the trial court properly ruled that Gummerson could not represent Alicia. Thus, we must first determine whether Richard met his burden to establish that he was Robert's client within the meaning of Rule 1.7.

¶ 30 The term "client" is not defined in the rules. However, this court has stated:

"The attorney-client relationship is consensual and arises only when both the attorney and the client consent. [Citation.] A client must manifest his authorization that the attorney act on his behalf, and the attorney must indicate his acceptance of the power to act on the client's behalf. [Citation.]" *Formento v. Joyce*, 168 Ill. App. 3d 429, 435-36 (1988).

¶ 31 In this case, Richard did not testify at the hearing. Further, the trial court found that Richard did not retain Robert. The record supports this finding. In addition, Robert testified that he never met Richard or spoke with him. Richard never paid Robert or signed an agreement retaining him, and Robert did not enter Richard into his client conflicts database. Further, there was no evidence that Richard authorized Paulette to engage Robert to act on

his behalf, discuss his case with Robert, or seek Robert's advice regarding his case. Therefore, there was no evidence whatsoever that Richard authorized either Robert or his firm, either directly or indirectly, to act on his behalf or that Robert accepted the power to act on Richard's behalf. See *Formento*, 168 Ill. App. 3d at 435-36. Accordingly, Richard failed to meet his burden to establish that he was Robert's client pursuant to Rule 1.7. As a consequence, Richard could not possibly meet his burden to establish that an attorney-client relationship between Robert and Richard was imputed to the firm, including Gummerson, thus disqualifying Gummerson pursuant to Rule 1.10.

¶ 32    Richard cites *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978), for the proposition that an attorney-client relationship can exist in the absence of an express agreement. We do not disagree with this proposition. However, while the relationship can exist without an express agreement, it " 'hinges upon *the client's belief* that he is consulting a lawyer in that capacity and *his manifested intention* to seek professional legal advice.' [Citations.]" (Emphases added.) *Westinghouse*, 580 F.2d at 1319. In this case, it was uncontroverted that Richard did not consult Robert directly. Further, there was no evidence that Richard knew that Paulette would consult Robert regarding the case and there was no evidence that Richard manifested his intention to direct Paulette to seek Robert's legal advice. Thus, *Westinghouse* does not support Richard's argument that an attorney-client relationship existed between Robert and himself.

¶ 33                                          2. Agency

¶ 34    Richard also argues that, because Paulette was his attorney, she was his agent and, as his agent, she had the authority to seek advice and counsel on Richard's behalf. Richard thus contends that, based on Paulette's authority to act as his agent, Robert was his attorney.

¶ 35    In general, the attorney-client relationship is one of principal and agent. *Lydon v. Eagle Food Centers, Inc.*, 297 Ill. App. 3d 90, 93 (1998). To act with proper authority on behalf of a client, an attorney must have either actual or apparent authority to do so. See *Lydon*, 297 Ill. App. 3d at 93.

¶ 36    Actual authority can be either express or implied. *Lydon*, 297 Ill. App. 3d at 94. Express authority exists when a principal explicitly grants an agent the authority to perform a particular act. *Amcore Bank*, 326 Ill. App. 3d at 135. In this case, there was no evidence that Richard expressly authorized Paulette to speak with Robert, seek his advice, or show him allegedly confidential documents. Moreover, seeking legal advice does not necessarily include either an offer or an acceptance to establish an attorney-client relationship. Thus, Richard failed to prove that Paulette had express authority to seek Robert's counsel on his behalf or otherwise discuss the creation of an attorney-client relationship between Robert and Richard.

¶ 37    Implied authority is authority that is inherent in an agent's position, and it is proved by circumstantial evidence. *Amcore Bank*, 326 Ill. App. 3d at 136. In this case, there was no evidence that Richard's words or conduct implied that he authorized Paulette to discuss his allegedly confidential legal matters with Robert without Richard's prior approval. Thus, Richard failed to prove that Paulette had implied authority to seek Robert's counsel on Richard's behalf.

¶ 38 Apparent authority exists when the principal, through words or conduct, creates a reasonable impression that his agent had the authority to perform a certain act. *Lydon*, 297 Ill. App. 3d at 95. Only the principal's words and conduct, not those of the agent, establish the agent's authority. *Amcore Bank*, 326 Ill. App. 3d at 134. In this case, as noted, it is uncontroverted that Richard never met with or spoke to Robert. Further, there was no evidence that Richard did or said anything that would indicate that he gave Paulette the authority to seek Robert's counsel about his case or show Robert his allegedly confidential documents. Thus, Richard failed to prove that Paulette had apparent authority to seek Robert's counsel.

¶ 39 Because Richard failed to show that Paulette had either actual or apparent authority to seek Robert's advice on his behalf, he failed to prove that he was Robert's client.

¶ 40                          3. Personal Conflict Imputed to Firm

¶ 41 Alicia argues that, even if Robert could not represent Alicia due to a personal conflict of interest pursuant to Rule 1.7(a)(2), this conflict would not be imputed to his firm, and to Gummerson, pursuant to Rule 1.10. Alicia cites Rule 1.10, comment 11, which provides in relevant part: "The disqualification arising from a close family relationship is personal and ordinarily is not imputed to members of firms with whom the lawyers are associated. See Rule 1.10." Ill. Rs. Prof'l Conduct R. 1.10 cmt. 11 (eff. Jan. 1, 2010). Conversely, Richard argues that Robert's personal conflict of interest must be imputed to the firm, and to Gummerson, because Paulette asked Robert for advice about the case, even asking Robert to "[p]ut your lawyer hat on." Essentially, Richard is repeating his earlier argument that he was Robert's client. Because we already rejected this argument, we need not address it again.

¶ 42 Further, in order for a personal conflict of interest to be imputed, it must "present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." Ill. Rs. Prof'l Conduct R. 1.10 (eff. Jan. 1, 2010). In this case, Gummerson's client was Alicia, not Richard. To protect Alicia's interests, Gummerson testified, he adhered to his firm's thorough client intake screening process and he set up a "Chinese wall" to ensure that no confidential information concerning Alicia's case would pass through to Robert. Gummerson testified that he told his partners, including Robert, and associates about the "Chinese wall." In addition, Gummerson spoke with his paralegal and secretary and sent a memo to his staff, partners, and associates about the issue. Further, before Alicia retained Gummerson, he told Robert that Robert could not be involved in the case, participate in it or discuss it.

¶ 43 Such preventive measures have been held sufficient to prevent the imputation of a personal conflict to an entire law firm. In *In re Marriage of Thornton*, 138 Ill. App. 3d 906, 916 (1985), a former judge circulated a memo to the employees of his new law firm that he was not to be consulted about or have access to files regarding a case on which he had heard motions when he was a sitting judge. The appellate court held that, although the former judge was disqualified from the case, the screening procedure was sufficient to prevent the entire firm from being disqualified. *Thornton*, 138 Ill. App. 3d at 917.

¶ 44 In this case, the trial court found that Gummerson's efforts were "too late." However, Gummerson's actions were taken before he was retained by Alicia. Therefore, Gummerson's

preventive screening actions were timely and sufficient, and the trial court erred by finding to the contrary.

¶ 45    Richard argues that "Paulette Gray relayed confidential information to Robert Gray relative to Richard." However, this argument is not supported by citation to the record; thus, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Argument" section of appellant's brief "shall contain" citation to "the pages of the record relied on"); *Lozman v. Putnam*, 379 Ill. App. 3d 807, 823 (2008) (appellant forfeited an argument where he failed to support facts with citation to the record).

¶ 46    Richard notes that the trial court found that "confidential information was at least passed" between Paulette and Robert. However, this finding is not supported by the record. Neither Paulette nor Robert testified that Robert heard or saw confidential information. The record indicates that Robert was privy only to documents that were filed with the court. Thus, these documents were not confidential. See *Schwartz*, 177 Ill. 2d at 183-84 (holding that a document that was filed with the court became a public record and, thus, did not contain confidential information for purposes of the Rules of Professional Conduct). Accordingly, the trial court erred by finding that confidential information was passed between Paulette and Robert. Therefore, Richard failed to establish that there was a significant risk that Robert's personal conflict of interest would materially limit Gummerson's representation of Alicia. See Ill. Rs. Prof'l Conduct R. 1.10 (eff. Jan. 1, 2010).

¶ 47                    B. Paulette's Discussion With Gummerson

¶ 48    Alicia argues that any application by the trial court of Rule 1.7 or 1.9 to disqualify Gummerson based on his conversation with Paulette at the courthouse was erroneous. We agree.

¶ 49    In his motion to disqualify, Richard alleged that Gummerson had a duty to Richard because Paulette sought Gummerson's advice about whether she should seek sanctions against Wakeman. Therefore, Richard alleged, he was Gummerson's current or former client and Gummerson was prohibited from representing Alicia pursuant to Rules 1.7 and 1.9, respectively.

¶ 50    Regarding Rule 1.7, the trial court found that Richard did not retain Gummerson. The record supports this finding. Richard presented no evidence that he manifested his authorization that Gummerson act on his behalf or that Gummerson indicated his acceptance of the power to act on Richard's behalf. See *Formento*, 168 Ill. App. 3d at 435-36. Further, Richard presented no evidence that he gave Paulette the reasonable impression that he gave her the authority to seek advice from Gummerson. See *Amcore Bank*, 326 Ill. App. 3d at 134; *Lydon*, 297 Ill. App. 3d at 95. Therefore, based on the record and the implication of the trial court's finding, Richard failed to establish that he was Gummerson's concurrent client pursuant to Rule 1.7. Furthermore, we do not believe that such a courthouse conversation, occurring in public and regarding the foibles or idiosyncrasies of practicing in a particular circuit, is the type of conversation that should be considered an offer and acceptance creating an attorney-client relationship and the attendant duties, obligations, rights, and privileges that inure to both the alleged client and the allegedly retained attorney.

¶ 51        Regarding Rule 1.9, a party seeking disqualification based on former representation of a client must establish: (1) the existence of a former attorney-client relationship; and (2) that the former and subsequent relationships are substantially related. *Klehm*, 363 Ill. App. 3d at 380. The party seeking disqualification based on former representation pursuant to Rule 1.9 bears the burden of proving both elements. *In re Marriage of Hines*, 356 Ill. App. 3d 197, 198 (2005).

¶ 52        In this case, Richard failed to provide any evidence to meet his burden regarding the first requirement. Gummerson testified that he never spoke with, met with, or saw Richard. Further, there was no evidence that Paulette had the authority to seek Gummerson's advice on behalf of Richard. Thus, the trial court had no basis pursuant to Rule 1.9 to disqualify Gummerson based on his conversation with Paulette.

¶ 53        Assuming, *arguendo*, that Richard established a former attorney-client relationship between himself and Gummerson, Richard failed to meet his burden regarding the second requirement. To determine whether the former and subsequent relationships are substantially related, a court must consider, *inter alia*, whether "it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters." *Schwartz*, 177 Ill. 2d at 178 (citing *LaSalle National Bank v. County of Lake*, 703 F.2d 252, 256 (7th Cir. 1983)). In this case, there was no evidence that Gummerson acquired any confidential information about Richard during his conversation with Paulette. Paulette told Gummerson only that personal financial information was contained in documents attached to the interim fee petition filed by Wakeman. Further, it was uncontroverted that Gummerson did not see the petition or its attachments or know of its specific contents. Because Richard failed to present evidence that Gummerson acquired confidential information during their purported former attorney-client relationship, he failed to establish that the former and subsequent relationships were substantially related. See *Klehm*, 363 Ill. App. 3d at 381. Accordingly, any application of Rule 1.9 to disqualify Gummerson was an abuse of discretion. Because "no reasonable person would agree with the position adopted by the trial court" that Rule 1.7, 1.9, or 1.10 prohibits Gummerson from representing Alicia in this case, the trial court abused its discretion by granting Richard's motion to disqualify Gummerson. See *Schwartz*, 177 Ill. 2d at 176.

¶ 54        For these reasons, the judgment of the circuit court of McHenry County is reversed and the cause is remanded.

¶ 55        Reversed and remanded.