2024 IL App (1st) 230998-U

SECOND DIVISION
May 14, 2024

No. 1-23-0998

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the |
| ROBERT P. JANEV, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellee, | ) | |
| | ) | 22 D3 30122 |
| and | ) | |
| | ) | Honorable |
| SABRINA N. LLOYD, | ) | Rosanna Patricia Fernandez, |
| | ) | Judge Presiding |
| Respondent-Appellant. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Reversed. Petitioner did not carry burden of establishing basis for disqualification of counsel.

¶ 2    Robert Janev and Sabrina Lloyd are in the midst of a divorce. Shortly after Robert filed his petition for dissolution of marriage, the couple hired Karen Paige, an attorney with Beermann LLP who worked out of its office in Bannockburn, Illinois, to act as a third-party mediator. They engaged in approximately six mediation sessions from April to August 2022. In August, the couple ended their attempts at mediation.

¶ 3    In January 2023, Sabrina began looking for a new attorney. She reached out to Joseph R.

Napoli, also an attorney for Beermann LLP but who worked out of its Chicago office.

On January 23, Napoli contacted Robert's counsel and asked them to waive a "potential" conflict

of interest vis-à-vis Beermann representing Sabrina. But Robert refused to waive the conflict. So

Beermann researched the issue and concluded that it could represent Sabrina notwithstanding

Paige's conflict. On February 1, Napoli contacted Robert's counsel again to let them know that

Beermann would be filing an appearance for Sabrina. Beerman did so the next day, February 2.

¶ 4    Before filing this appearance, however, Beermann circulated a firm-wide document

entitled, "SCREENING MEMO RE: THE LLOYD/JANEV MATTERS." In short, the memo

barred anyone at the firm from discussing the Lloyd/Janev divorce with Paige or her assistant. It

further removed Paige and her assistant's access to any file associated with Beerman's

representation of Sabrina. Conversely, it also barred every other Beermann employee from

accessing Paige's files from the Lloyd/Janev mediation.

¶ 5    A week after Beermann entered its appearance for Sabrina, Robert moved to disqualify

the firm. Citing a litany of Rules of Professional Conduct relating to conflicts of interest and

confidentiality of information, he argued that "[t]he appearance of impropriety is overwhelming

here," presenting "the classic example of a conflict of interest."

¶ 6    Beermann responded by noting that, though Robert cited a number of ethical rules, he did

not cite the one rule that governed the issue of disqualification here—Illinois Rule of

Professional Conduct 1.12. Beermann argued that they had timely complied with the

requirements of Rule 1.12(c), primarily by timely screening Paige from the case.

¶ 7    The court held a hearing, though not an evidentiary one—just oral argument on the

written submissions. At that hearing, Robert distanced himself from the rules cited in the

disqualification motion and exclusively focused on whether Beermann had complied with Rule 1.12. He argued that Beermann's screening was not timely, as it occurred several months after Paige had performed the mediation services. Robert speculated that Paige could have talked about the case to others in the firm because, in his counsel's words, this qualifies as a "crazy" case. To summarize the argument:

> "At a minimum, Judge, the screening should have occurred at the time Ms. Lloyd first called Beermann's office to inquire about representation. We believe that to be on or before January 20th based on the fact that that's when [Robert's counsel] got his first call.
>
> In theory the screening probably should have occurred what I believe to be timely after three mediation sessions, as well as well over $10,000 paid to Beermann's office should have incurred at the time mediation broke down, which would have been on or about August 1st.
>
> So from August 1st to February 1st Ms. Paige's records were theoretically open to any other authorized user at the Beermann law firm, as was the hard file. To thereafter enter a screening memo on February 1st stating no one can talk to Ms. Paige, no one can talk to her associate, I mean you can't really unring a bell."

¶ 8    Sabrina responded that Beermann had followed each of the requirements in Rule 1.12, and their representation of Sabrina was proper. She criticized Robert's argument as pure speculation, noting that counsel admitted he had no evidence of any *actual* improper sharing of information. Napoli argued that Robert's fears about "watercooler" talk were unfounded, as Napoli and Paige worked in different Beermann offices. Ultimately, Sabrina simply claimed that Robert's motion was based on "a misreading of Rule 1.12."

¶ 9    After taking the motion under advisement, the court issued an oral ruling granting

Robert's motion to disqualify, finding

"that the potential of significant risk and harm to the petitioner in this particular matter

does far outweigh the respondent's right to choice of counsel, particularly in this scenario

where there was significant information that was disclosed, exchanged and relayed to the

mediator, who the parties both met with, with the confidence that none of the information

would be disclosed.

Now, to make it clear, I have not accused anyone of having disclosed anything.

However, there is the probability and possibility of potential significant harm to the

petitioner if, in the future, any minor information is disclosed, as opposed to respondent

having an opportunity to be able to retain another lawyer, still, of course, at her choice."

¶ 10    Sabrina petitioned for leave to appeal under Illinois Supreme Court Rule 306(a)(7) (eff.

Oct. 1, 2020), which allows permissive interlocutory appeals from disqualification orders. Robert

filed a response. We granted the petition. In lieu of additional briefing, the parties elected to

stand on their respective petition and response.

¶ 11    We interpret our Rules of Professional Conduct as we would statutes. *Stephenson*, 2011

IL App (2d) 101214, ¶ 26. If they are clear and unambiguous, we give them their plain and

ordinary meaning. *Id*. Our interpretation of a rule is a question of law subject to *de novo* review.

*Id*. So while we ordinarily review a trial court's disqualification decision for an abuse of

discretion (*Schwartz v. Cortelloni*, 177 Ill. 2d 166, 179 (1997)), a highly deferential standard, we

will not defer to the court's application of an incorrect legal standard. *Myrick v. Union Pacific

Railroad Company*, 2017 IL App (1st) 161023, ¶ 41.

¶ 12    We place great importance on the right to choose one's own counsel, even in civil cases;

we thus consider disqualification of an attorney "a drastic measure because it destroys the attorney-client relationship by prohibiting a party from representation by counsel of his or her choosing." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 178 (1997). Disqualification should be invoked "only when absolutely necessary." *In re Marriage of Stephenson*, 2011 IL App (2d) 101214, ¶ 19. The law imposes a "heavy burden" on the party seeking disqualification to prevent its use as a tactical weapon in litigation. *Id*.; *Macknin v. Macknin*, 404 Ill. App. 3d 520, 530 (2010); see *Schwartz*, 177 Ill. 2d at 178 ("caution must be exercised to guard against motions to disqualify being used as tools for harassment."). Critically, disqualification must be based on an actual conflict and not solely on the appearance of impropriety. *Schwartz*, 177 Ill. 2d at 179; *Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 34.

¶ 13    Unsurprisingly, the Illinois Rules of Professional Conduct generally prohibit lawyers from representing clients when a conflict of interest exists. There are obviously many variations of conflicts that might occur and myriad factual scenarios. The rules address them separately, often with different tests and remedies. The rules cover conflicts involving current clients and former clients, unique conflicts of interests involving former and current government officials, conflicts regarding former judges, arbitrators, and mediators, and conflicts when a lawyer is employed by an organization. See Ill. R. Prof'l Conduct (2010) Rs. 1.7 - 1.13 (eff. Jan. 1, 2010). The rules explain when a lawyer is disqualified in that given situation and, relevant here, when that lawyer's conflict may be imputed to that lawyer's entire law firm. *Id*.

¶ 14    So it is obviously essential to identify the correct rule that applies in a given situation to ensure that the court employs the proper tests and remedies. Though in his written motion to disqualify, Robert cited a number of inapplicable rules and not the correct one, by the time of oral argument and now on appeal, the parties are in agreement (as are we) that the applicable rule

is Rule 1.12, governing conflicts involving a former judge, arbitrator, mediator, or other third-party neutral. See *id.* R. 1.12.

¶ 15    Rule 1.12(a) provides that, absent client consent, "a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as *** an arbitrator, mediator or other third-party neutral." *Id.* R. 1.12(a). There is no dispute, then, that Paige, the former mediator, would be disqualified from representing Sabrina in the divorce proceeding. The question is whether the other lawyers in Paige's firm are disqualified, too, the concept known as imputation.

¶ 16    Generally speaking, an individual lawyer's conflict imputes to her firm per Rule 1.10. See *id.* R. 1.10(a). But as Rule 1.10 itself notes, when Rule 1.12 governs the conflict of interest, as here, Rule 1.12 governs the question of imputation, too. See *id.* R. 1.10(d) ("The disqualification of lawyers associated in a firm *** with former judges, arbitrators, mediators or other third-party neutrals is governed by Rule 1.12."); *id.* R. 1.10, cmt 7 (when conflict stems from lawyer's participation as mediator or other third-party neutral, "imputation is governed by Rule 1.12, not this Rule.").

¶ 17    So in determining whether Paige's disqualification should be imputed to Napoli and the firm writ large, we turn to Rule 1.12(c):

> "If a lawyer is disqualified by paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in the matter unless:
>
>> (1) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is promptly given to the parties and any appropriate tribunal to enable them to ascertain compliance with the provisions of this Rule." *Id*. R. 1.12(c).

¶ 18    As there is no argument here that the law firm failed to give prompt notice under subpart (c)(2), nor is there an issue regarding the apportionment of fees, the only question is whether the law firm "timely screened" Paige "from any participation in the matter" under subpart (c)(1). *Id*. The trial court did not focus on that question, instead ruling based on "the potential of significant risk and harm" to Robert by permitting Napoli to represent Sabrina.

¶ 19    In fairness to the court, the judge was likely led astray by the written submission below by Robert, who, among several other rules of professional conduct, cited one governing conflicts involving current clients, which contained that "significant risk" language. See *id*. R. 1.7(a)(2). In any event, while we commend the court for its concern for protecting the litigants' interests, when the conflict stems from the lawyer's role as a former mediator, the timely screening of that the lawyer is the mechanism by which a law firm avoids that risk of harm, thus avoiding imputation of the conflict. See *In re Marriage of Thornton*, 138 Ill. App. 3d 906, 917 (1985) (timely screening under Rule 1.12 precluded disqualification of law firm). So the question before us, as Sabrina has argued from day one, is whether Beermann "timely screened" Paige from this matter. Ill. R. Prof'l Conduct (2010) R. 1.12(c)(1) (eff. Jan. 1, 2010).

¶ 20    Under Rule 1.0, the definitional section, the word "screened" means "the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these Rules or other law." *Id*. R. 1.0(k). A comment to Rule 1.0 provides some substantive detail to the content of the screening and warrants quoting in full:

"The purpose of screening is to assure the affected parties that confidential information known by the personally disqualified lawyer remains protected. The personally disqualified lawyer should acknowledge the obligation not to communicate with any of the other lawyers in the firm with respect to the matter. Similarly, other lawyers in the firm who are working on the matter should be informed that the screening is in place and that they may not communicate with the personally disqualified lawyer with respect to the matter. Additional screening measures that are appropriate for the particular matter will depend on the circumstances. To implement, reinforce and remind all affected lawyers of the presence of the screening, it may be appropriate for the firm to undertake such procedures as a written undertaking by the screened lawyer to avoid any communication with other firm personnel and any contact with any firm files or other information, including information in electronic form, relating to the matter, written notice and instructions to all other firm personnel forbidding any communication with the screened lawyer relating to the matter, denial of access by the screened lawyer to firm files or other information, including information in electronic form, relating to the matter, and periodic reminders of the screen to the screened lawyer and all other firm personnel."

*Id.* R. 1.0, cmt. 9.

¶ 21     The screening procedure that Beermann undertook here, as discussed briefly above, consisted of several components. First, in its screening memorandum distributed to all lawyers and staff, Beermann forbade Paige and her assistant from communicating with anyone else at the law firm about this divorce case. They were also forbidden from "contact with any firm files or other materials relating to" this divorce action. The firm's attorneys and staff were instructed as follows: "Do not give [Paige or her assistant] access to any files, papers, or other materials

- 8 -

relating to" this divorce action. And finally, the screening memorandum directed that "[o]ur computer network administrator, through user permission controls, will deny access to [Paige and her assistant] to the [divorce action]'s documents stored in the firm's document management or other data processing systems."

¶ 22    Next, Beermann opted to treat every member of the firm, other than Paige and her assistant, as disqualified from the now-concluded mediation that Paige conducted with Sabrina and Robert. "All lawyers and staff" were instructed that "they may not communicate with [Paige and her assistant] with respect to the Mediation Matter." Beermann also instructed that "[a]ll Beermann attorneys and staff, except for [Paige and her assistant] will be screened from all files, papers, other materials relating to the Mediation Matter, and will be excluded from access to the Mediation Matter file on the firm's computer system."

¶ 23    The screening memorandum was signed by Paige, her assistant, and the Beermann attorney who handled conflict matters for the firm.

¶ 24    In short, the screening procedure barred Paige and her assistant from discussing the divorce or mediation with anyone else at the law firm; forbade Paige and her assistant access to the physical and electronic files related to the divorce; and denied access to everyone at the law besides Paige and her assistant to the physical and electronic files relating to the now-defunct mediation matter.

¶ 25    It is hard to imagine a more comprehensive screening procedure. It checked all the boxes mentioned in comment 9 to Rule 1.0, discussed above. And it is more than compatible with screening procedures we have approved in other cases. See, *e.g.*, *Stephenson*, 2011 IL App (2d) 101214, ¶ 42 (new counsel set up "wall" to ensure no confidential information would pass to or from disqualified attorney and notified all employees of firm); *Thornton*, 138 Ill. App. 3d at 917

(former judge circulated memo to employees of his new law firm that he could not discuss or review any information relating to case on which he had ruled as motion judge).

¶ 26     Robert does not seriously contest the *adequacy* of the screening so much as he challenges its *timeliness*. The word "timely" is undefined in the Rules, but comment 10 to Rule 1.0 says this much: "In order to be effective, screening measures must be implemented as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening." Ill. R. Prof'l Conduct (2010) R. 1.0 cmt. 10 (eff. Jan. 1, 2010).

¶ 27     That's a good start, but one of Robert's principal concerns, rightly so, is what may have transpired during that window of time when Paige conducted mediation (ending in August 2022) and then the multiple months that followed before Sabrina contacted Napoli for possible representation (January 2023). During that window of time, Paige would have had no particular reason to believe that one day, one of the parties to the mediation would contact Napoli, her fellow attorney at Beermann, for representation. To put the finest point on it, imagine that Paige reached out to Napoli for consultation during the ongoing mediation, in the process disclosing material information that Robert provided her. No amount of screening could unring that bell.

¶ 28     It is perhaps for this reason that Sabrina, in responding to the motion to disqualify, submitted an affidavit from Napoli in which Napoli swore that he has "not, nor ever, spoken to [Paige or her assistant] about any detail at all about this instant matter, which includes any topic relative to Sabrina Lloyd and/or Robert Janev," and he has "not spoken, texted, emailed, telephoned, or utilized any other mode of communication in which to communicate with [Paige or her assistant] regarding this instant matter." That affidavit was unchallenged and unrebutted.

¶ 29     Both at oral argument below and before this court, Robert argues that the screening procedures should have been implemented sooner. As noted in more detail above (see *supra* ¶ 7),

Robert argued that, "[a]t a minimum *** "the screening should have occurred at the time [Sabrina] first called Beermann's office to inquire about representation. We believe that to be on or before January 20th [of 2023] based on the fact that that's when [Robert's counsel] got his first call" asking for a waiver of a potential conflict. Robert went on to argue that, "[i]n theory, the screening probably should have occurred *** after three mediation sessions, as well as over $10,00 paid to Beermann's office *** at the time mediation broke down, which would have been on or about August 1st" of 2002.

¶ 30     We will take the latter point first. It would be unreasonable and impractical for Paige to have initiated conflict-screening procedures around the time the mediation broke down in August 2022, before she could have had the slightest idea that one of the parties might contact another Beermann lawyer for representation. If that were the precedent, it is hard to imagine a principled limitation short of requiring every attorney conducting a mediation to immediately implement screening procedures at the conclusion of every mediation on the off-chance that someone else at their law firm might one day be contacted for related representation. Indeed, if that were the rule, there is no particular reason why it should be limited to mediations; any attorney, whenever they deal with any client on any matter whatsoever, might be required to immediately initiate screening procedures on even the infinitesimal possibility that a conflict might arise in the future. That rule would be unreasonable, impractical, and unduly burdensome, not to mention entirely inconsistent with comment 10 to Rule 1.0. See *id.*

¶ 31     Robert's first point, far narrower, is that Napoli should have begun implementing screening procedures as soon as Sabrina first contacted him for representation—literally that same day or soon thereafter. Our record is not precise on the timeline here. The motion to disqualify does not allege the date that Sabrina first contacted Napoli. It does allege that Napoli

first contacted Robert's counsel about Sabrina's interest in retaining him, and whether Robert would waive any conflict, on Monday, January 23, 2023. The motion does not state when Robert gave his response, but at oral argument, Robert's counsel stated that on January 25—a Wednesday—he advised Napoli that Robert would not waive the conflict.

¶ 32    The motion then alleges that, "on or about February 1, 2023"—the following Wednesday—Napoli contacted Robert's counsel again and advised him that "he did not believe a conflict would in any way prejudice Robert." February 1 was the day the screening procedure was implemented. The next day, February 2, Beermann filed its appearance on behalf of Sabrina.

¶ 33    So while Robert argues before us, as he did below, that Napoli and Beermann should have begun implementation procedures sooner—as soon as Sabrina contacted Beermann— Beerman began implementation procedures within a little more than a week (as best we can tell) after Sabrina first contacted Beerman and within seven calendar days—five business days—from the date that Robert refused to waive the conflict.

¶ 34    It does not strike us as unreasonable for Beerman to await word from Robert as to whether he would waive a conflict. Once Robert said he would not, five business days does not strike us as a particularly long time for Napoli to have reached out to the Beerman attorney handling ethics questions, research the ethical rules (Robert's motion to disqualify alone shows that there are many, covering overlapping fact patterns), and put together a screening procedure that satisfies the relevant rule. And critically, there is no evidence in the record that anything improper occurred during that brief window of time from January 23 to February 1.

¶ 35    Thus, taking a cue from comment 10 to Rule 1.0, Robert did not carry his burden of demonstrating that the screening procedure was *not* undertaken "as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening." *Id*.

¶ 36    There is, to be sure, much we do not know. Robert notes, for example, that Paige never filed an affidavit in this matter, so there is no testimony from her that she never talked to Napoli about the mediation or, for that matter, that she never talked to anyone else in the firm about the mediation. We could probably poke holes in Napoli's affidavit, too, if so inclined—while he said he never discussed the mediation matter with Paige or her assistant, he never swore in that affidavit that he never looked at the files from the mediation matter.

¶ 37    But the law is clear that the burden lies here with Robert, the party seeking disqualification. *Schwartz*, 177 Ill. 2d at 177-78; *Stephenson*, 2011 IL App (2d) 101214, ¶ 19. Robert did not seek discovery or an evidentiary hearing, opting for a paper-only hearing. Compare *Stephenson*, 2011 IL App (2d) 101214, ¶¶ 6-12 (evidentiary hearing held on motion to disqualify). In fact, Robert openly conceded that he had no information or even reason to believe that Paige had improperly disclosed any protected information, and the trial court in ruling said much the same thing.

¶ 38    With the record showing no evidence that any improper communications took place before the screening, with the screening procedures being implemented roughly one week after Sabrina first contacted Beermann and Napoli for representation, and with the screening procedures themselves being consistent with those we have upheld in the past and fully consistent with comment 9 to Rule 1.0, the only conclusion we could possibly draw is that Beermann timely screened Paige from the divorce action before us, and thus no basis for disqualification is present.

¶ 39    To be sure, the screening procedure is the very definition of an "honors system." We have every confidence that the attorneys at Beermann are fully aware of the consequences of any breach of the screening procedure. And of course, should Robert ever come upon any

information in the future of such a breach, nothing prevents him from raising this issue again with the trial court.

¶ 40     The judgment of the circuit court is reversed. The cause is remanded with instructions to allow Beermann LLP to appear on behalf of Sabrina.

¶ 41     Reversed and remanded with instructions.