2016 IL App (1st) 143858
No. 1-14-3858
Opinion filed April 13, 2016

THIRD Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| RAKESH CHANDRA, M.D., | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
|     Plaintiff-Appellee/Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 13 CH 25015 |
| | ) | |
| LOKESH CHANDRA, M.D., | ) | |
| | ) | The Honorable |
|     Defendant-Appellant/Cross-Appellee, | ) | Mary Lane Mikva, |
| | ) | Judge Presiding. |
|     and | ) | |
| | ) | |
| ROBIN B. POTTER and ASSOCIATES, | ) | |
| | ) | |
|     Defendant-Appellee/Cross-Appellant. | ) | |

_____

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Presiding Justice Mason and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1      Following recovery in a *qui tam* action, plaintiff-appellee/cross-appellant Rakesh

Chandra, M.D. (Rakesh) filed a cause of action for declaratory judgment against defendant-

appellant/cross-appellee Lokesh Chandra, M.D. (Lokesh) and defendant-appellee/cross-appellant Robin B. Potter and Associates (Potter), seeking to enforce a contract entered into by the parties. Potter filed a cause of action for declaratory judgment against Lokesh in the same vein, also seeking to enforce the contract. Lokesh, meanwhile, filed answers and defenses, as well as a counterclaim and crossclaim, seeking to have the contract declared unenforceable. Rakesh and Potter eventually filed motions for judgment on the pleadings and for prejudgment interest. After briefing and argument, the trial court granted their motions in part by finding the contract at issue to be enforceable, but denied their request for prejudgment interest.

¶ 2        Lokesh appeals, contending that the trial court erred in finding the contract enforceable. He asserts that there was no consideration from Rakesh in forming the contract and that the contract itself violated the Illinois Rules of Professional Conduct (Rules) (Ill. R. Prof. Conduct (2010) R. 1.1 *et seq.* (eff. Jan 1, 2010)). Lokesh asks that we reverse the trial court's grant of judgment on the pleadings, vacate this portion of its order and remand the matter for further proceedings or other just and necessary relief. Concurrently, both Rakesh and Potter appeal the trial court's denial of their requests for prejudgment interest.[1] They contend that the court erred in this portion of its determination because Lokesh's actions prevented the distribution of funds to which they were entitled under the contract, depriving them of the use and benefit of the proceeds. They ask that we reverse this portion of the trial court's order and award them the interest sought. For the following reasons, we affirm in part, and reverse in part and remand with directions.

---

[1] Rakesh and Potter have each filed their own separate briefs in this appeal and each is represented by separate counsel.

¶ 3                                    BACKGROUND

¶ 4          Rakesh and Lokesh are brothers and physicians licensed to practice in Illinois.  Sushil

Sheth, also a physician, covered several of Lokesh's patients.  When he did so, Sheth billed

Medicare, Medicaid and the private payor directly.  Eventually, Lokesh began receiving

complaints from his patients regarding bills they were receiving from Sheth.  Around March

2006, Lokesh grew suspicious that Sheth was committing medical billing fraud and spoke to

Rakesh, who had experience with this and who is also an attorney, to determine if he

(Lokesh) had any reporting obligations.  Lokesh provided Rakesh with billing documentation

and, upon his review and analysis, Rakesh recommended that Lokesh speak with an attorney.

After discussing this, Lokesh agreed to allow Rakesh to find qualified counsel.  Rakesh did

so and found Potter.  All the parties agreed to meet on March 11, 2006.

¶ 5          On that date, Rakesh went to Potter's office; he brought her materials and documents

related to the fraud claims against Sheth, which he had reviewed, prepared and organized.

Lokesh, meanwhile, attended the meeting via telephone.  Potter told Rakesh and Lokesh that

she needed some time to review and consider the documentation Rakesh had provided to

determine whether there was a viable cause against Sheth and how best to proceed.

Accordingly, the parties agreed to meet the next day.

¶ 6          On March 12, 2006, Rakesh, Lokesh and Potter all met in person at Potter's office.  After

considering the information and documents Rakesh had provided, Potter believed there was a

viable cause of action for fraudulent billing against Sheth and she offered to provide

representation.  Potter explained to Rakesh and Lokesh that the cause could proceed as a *qui*

*tam* action against Sheth under the federal False Claims Act (FCA) (31 U.S.C. §§ 3729-3733

(2012)), where plaintiffs, or relators, would bring the cause, as filed under seal, in both their

own right and on behalf of the government to recover sums that the government paid in false claims, and the government would review the allegations and evidence to determine whether to intervene. Potter further advised that both brothers could be named as relators in the suit; however, after some discussion, the parties agreed that only Lokesh would be a named relator.

¶ 7    Accordingly, the parties formed and entered into a two-page document entitled "Contract for Legal Services." The contract named both Lokesh and Rakesh as Potter's "clients" and stated that they both retained and employed the firm to represent them in the *qui tam* action against Sheth. The contract further stated that while the parties "agree that only Lokesh" would be a "named" relator in the suit, they also "agree" that Lokesh and Rakesh "will equally share in the relators' share and relators' costs in this case." With respect to attorney fees and services, the contract described that Potter would assume all legal fees and costs, and that Lokesh and Rakesh agree to assign all sums recovered for legal fees, were the suit be successful, to her. The contract also noted that Lokesh and Rakesh agree to pay attorney fees for services, and that this would amount to 40% of any award obtained in the suit. Finally, the contract stated that Lokesh and Rakesh "will be responsible for payment from the final proceeds in this case" and granted "a lien on any recovery for the reimbursement of costs and the payment" of attorney fees. At the conclusion of the meeting, Lokesh, Rakesh and Potter all initialed the first page of the contract and all signed the second page.

¶ 8    Following the signing of the contract and Potter's retention as their counsel, Potter drafted a complaint in order to proceed with the *qui tam* action against Sheth pursuant to the FCA and named Lokesh as the plaintiff-relator, as per the parties' agreement in the contract. Rakesh alleges that he continued to work with Potter to provide her with information

regarding the suit when she asked for it; Potter corroborates Rakesh's statements, while Lokesh insists that Rakesh had no further involvement in the suit. Ultimately, Potter filed under seal the *qui tam* action in federal court under the FCA, the government found that it had merit and elected to intervene, and the cause resulted in a plea agreement and judgment in excess of $20 million against Sheth. The parties were notified that the relator's share of the settlement would be $1,335,569.86, and would be distributed by the government on September 19, 2013. However, on September 16, 2013, three days before this was to occur, Lokesh, who had now retained new counsel, sent a letter to Potter asserting that the contract signed by the parties was invalid, insisting that Rakesh should not get any of the proceeds from the suit, and demanding that she deposit the entire sum into his (Lokesh's) personal account.

¶ 9    The *qui tam* recovery was deposited into Potter's client trust account. After Potter notified Rakesh that she could not now distribute any of the funds due to Lokesh's demand letter, Rakesh filed a cause of action against Lokesh and Potter.[2] He sought a declaratory judgment that the contract was enforceable and, thus, that he was entitled to one-half of the proceeds recovered pursuant to it plus prejudgment interest, and he alleged that Lokesh had breached both a written and oral contract to share equally with him in the recovery of the *qui tam* action. Lokesh attempted to remove the cause to federal court, but that court declined to exercise supplemental jurisdiction and remanded the matter to the state trial court. Soon thereafter, Potter filed a counterclaim seeking a declaratory judgment, just as Rakesh, that the contract was enforceable and that she was entitled to attorney fees in accordance with its

---

[2] By this time, both Rakesh and Potter had also obtained separate counsel, so neither party was represented by the other.

terms plus prejudgment interest. Lokesh filed answers and defenses, as well as a counterclaim and crossclaim, asserting that the contract was not enforceable for several reasons, including that it violated the Rules, that there was a lack of consideration in its formation, and that it was otherwise unreasonable and unconscionable.

¶ 10 Eventually, Rakesh and Potter each filed motions for judgment on the pleadings. Lokesh responded, asserting, in addition to his prior objections, that the contract amounted to impermissible fee sharing with respect to the *qui tam* action. Following a hearing, the trial court granted Rakesh's and Potter's motions, entering judgment on the pleadings in their favor and against Lokesh. Specifically, the court found that the "Contract for Legal Services," as signed by all the parties, was "valid and enforceable," that Potter was entitled to her contingency fee and costs from the underlying *qui tam* action, and that Rakesh and Lokesh "are to divide equally the remainder of the funds awarded in that suit." The court explained that it was "pretty undisputed that there was consideration" for Lokesh's promise to share the proceeds of the *qui tam* recovery with Rakesh, that the contract was not violative of the Rules, that there was no conflict of interest, and that the situation was not one amounting to fee sharing. However, in addressing Rakesh's and Potter's claims for prejudgment interest, the court denied their request, finding that, while it believed it was "Lokesh's objections" that had delayed the distribution of the funds, Lokesh had "not really [been] holding the money," since it had been deposited in Potter's client trust account and she "had no choice" but to hold the funds there until the matter was resolved. Accordingly, following the trial court's decision, and with no motion to stay being filed, Potter distributed the $1,355,569.86 *qui tam* recovery pursuant to the terms of the contract.

¶ 11                                                                        ANALYSIS

¶ 12          The instant cause presents both a direct and cross-appeal.  On direct appeal, Lokesh

challenges the trial court's decision to grant judgment on the pleadings against him and in

favor of Rakesh and Potter.  He contends that the trial court erred in finding that the contract

at issue was supported by consideration from Rakesh and that it did not violate the Rules.

Meanwhile, on cross-appeal, Rakesh and Potter challenge the trial court's decision to deny

them prejudgment interest.  They contend that Lokesh improperly deprived them of the use

and benefit of their portions of recovery from the underlying *qui tam* action.  We will

consider the direct appeal first.

¶ 13                                                           I. Lokesh's Direct Appeal

¶ 14          The parties agree that the instant direct appeal involves judgment on the pleadings and

focuses on the construction and interpretation of the contract into which they entered.  Under

both circumstances, our review is to proceed, as the parties assent, via a *de novo* standard of

review.  See *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385

(2005), and *Pekin Insurance Co. v. Allstate Insurance Co.*, 329 Ill. App. 3d 46, 49 (2002) (on

review from grant of judgment on the pleadings, reviewing court must ascertain *de novo*

whether the trial court correctly determined that the pleadings presented no issue of material

fact and whether it therefore correctly entered judgment); see also *Wiczer v. Wojciak*, 2015

IL App (1st) 123753, ¶ 33, and *Asset Recovery Contracting, LLC v. Walsh Construction Co.

of Illinois*, 2012 IL App (1st) 101226, ¶ 74 (the interpretation of contracts is subject to *de

novo* standard of review, but with the factual findings involved therein given deference by

the reviewing court).

¶ 15    Lokesh's first contention of error is that the trial court, in granting judgment on the pleadings in favor of Rakesh and Potter and against him, improperly found that the contract at issue was valid and enforceable because it was supported by consideration from Rakesh. Lokesh asserts that there is a material question of fact as to whether Rakesh provided consideration to him in exchange for his promise to give Rakesh one-half of his recovery from the *qui tam* action. In support of this argument, Lokesh insists that there could have been no consideration between the brothers pursuant to the FCA, that any promise Rakesh made to his detriment was merely illusory, and that there was no evidence that Rakesh did anything to support enforcement of the contract. We disagree.

¶ 16    A valid and enforceable contract requires an offer, acceptance and consideration. See *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 979 (1997). Consideration consists of a " 'bargained-for exchange of promises or performances, and may consist of a promise, an act or a    forbearance' " (*Carter v. SCC Odin Operating Co.*, 2012 IL 113204, ¶ 23 (quoting *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 487 (1997))), which is " 'of benefit to one party or disadvantage to the other' " (*Carter*, 2012 IL 113204, ¶ 23 (quoting *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977)). See *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 770 (2007) ("[a]n act or promise that benefits one party or is a detriment to the other party is consideration sufficient to support a contract"). The values exchanged between the parties need not be equal, and courts generally will not inquire into the adequacy of the consideration provided to support a contract. See *Carter*, 2012 IL 113204, ¶ 24; accord *Rohr Burg Motors, Inc. v. Kulbarsh*, 2014 IL App (1st) 131664, ¶ 48 (it is not the function of the court to review the amount of consideration). Rather, as the adequacy of the consideration is within the exclusive domain of the parties to the contract, where a contract is

entered into freely and without fraud, courts will presume that the consideration was adequate. See *McInnis v. OAG Motorcycle Ventures, Inc.*, 2015 IL App (1st) 142644, ¶ 27; accord *Carter*, 2012 IL 113204, ¶ 24. Courts will determine only whether consideration existed as a matter of law. See *Marriage of Tabassum*, 377 Ill. App. 3d at 770.

¶ 17    In addition, our state and its courts strongly favor the freedom of parties to contract and determine their own contractual obligations. See *Saba Software, Inc. v. Deere & Co.*, 2014 IL App (1st) 132381, ¶ 60 (parties should be unrestricted in making their own contracts). This allows parties to know beforehand what their rights and obligations are pursuant to the contract and to protect their expectations thereunder. See *Hussein v. L.A. Fitness International, L.L.C.*, 2013 IL App (1st) 121426, ¶ 11. In response, the primary objective of a court is to ascertain and give effect to the parties intent as evidenced by the plain language of the contract, which is to be read as a whole and fairly and reasonably interpreted. See *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 308 (2008); *Continental Casualty Co. v. Donald T. Bertucci, Ltd.*, 399 Ill. App. 3d 775, 780 (2010). Thus, when a contract's provisions are clear and unambiguous, a court must enforce them as written and without consideration of extrinsic aids. See *Goodman v. Hanson*, 408 Ill. App. 3d 285, 292 (2011). Ultimately, a court cannot rewrite a contract to provide a better bargain for one party or to give a party a better bargain than he himself contracted for originally. See *Leak v. Board of Education of Rich Township High School District 227*, 2015 IL App (1st) 143202, ¶ 14 (citing *Thompson v. Gordon*, 241 Ill. 2d 428, 449 (2011)).

¶ 18    At the outset, we note that Lokesh's argument here is wholly misplaced. That is, the only contract at issue here, and the contract at all relevant in this cause as examined by the trial court, is the contract the parties signed entitled "Contract for Legal Services." This contract,

9

as admitted by all the parties herein, including Lokesh, was, as its title makes clear, a contract for legal services entered into between Lokesh and Rakesh, who were specifically named as "clients," and Potter as an attorney, wherein the brothers together hired Potter to pursue the *qui tam* action against Sheth. It was, at its core, an attorney retainer agreement. Thus, Lokesh and Rakesh were on the same side of the contract; they did not contract with each other. Rather, the contract defined their relationship with Potter, who would be performing legal services for their benefit under the contract in exchange for monetary compensation, namely, fees and costs, they agreed to pay. Accordingly, any question of consideration provided, and its adequacy, would be in reference to the counter-parties to the contract, *i.e.*, Lokesh and Rakesh on the one side as the clients, and Potter on the other as the attorney. Due to its very nature, the contract at issue does not require any consideration between Lokesh and Rakesh, as Lokesh now argues; again, they were on the same side of the contract, which defined an exchange between them as a unit, and Potter, who was hired to perform on their behalf and to her detriment. Undeniably, Potter provided sufficient consideration for the contract, as she brought the *qui tam* action, pursued it, and secured a recovery in favor of her clients. The contract at issue was, as the trial court found, supported by consideration and, therefore, clearly enforceable.

¶ 19    Even were this not the case, and even if, as Lokesh argues, the contract somehow required consideration between he and Rakesh separate and apart from anything to do with Potter to support their agreement that they would equally share in the recovery of the *qui tam* action, Lokesh's argument that there was a lack of consideration invalidating the contract would still fail. This is because, in direct contradiction, the evidence demonstrates that there was, indeed, consideration on the part of Rakesh to support this agreement. First, and most

telling, Lokesh himself admitted during this litigation that Rakesh provided such consideration. See *Bonner v. Westbound Records, Inc.*, 76 Ill. App. 3d 736, 743-44 (1979) ("[w]here a contract is silent as to consideration, its existence may be established through parol evidence"). For example, in his judicial admissions, including his answer to the complaint in this cause, Lokesh stated that when he believed something was amiss in Sheth's billing of his patients, he went to Rakesh, showed Rakesh his discoveries and asked Rakesh whether he thought, upon his review, he (Lokesh) had any reporting obligations. Lokesh also admitted that, when Rakesh confirmed his suspicion of fraudulent billing, he (Lokesh) agreed to allow Rakesh to locate an attorney for further advice, which Rakesh did. And, Lokesh further admitted that, once Rakesh found Potter, Rakesh attended the initial meeting with her in person during which he brought her the materials related to the matter against Sheth. These admissions by Lokesh were in direct line with the claims made by Rakesh regarding his participation in this matter, and which were also corroborated by Potter.[3] As we noted earlier, the concept of legal consideration does not require the parties to an agreement to perform equal amounts of work or provide equal amounts of value. Clearly, and by Lokesh's own admissions, Rakesh's actions benefitted Lokesh and, thus, provided consideration for their agreement to split the proceeds of the *qui tam* action.

¶ 20    In addition to Lokesh's admissions, the contract itself clearly demonstrates that Rakesh provided consideration for the brothers' agreement here. The contract plainly states not only that both Lokesh and Rakesh are the clients and retain Potter to pursue the cause against Sheth, but also that, while agreeing only Lokesh would be the named relator, they would

---

[3] Rakesh further alleged that he continued to participate in the suit by actively assisting Potter in the provision of more documents and information as she needed; while Lokesh denied this, Potter again corroborated Rakesh.

11

together "equally share in the relators' share and relators' *costs* in this case" (emphasis added) and that they would both be "responsible for payment from the final proceeds." At the outset of this agreement, then, Rakesh assumed a risk, to his own detriment, as he bound himself to pay Potter's costs of bringing the *qui tam* action if there was a recovery. See *Palmetto Leasing Co. v. Chiles*, 235 Ill. App. 3d 986, 989 (1992) ("a promise based upon consideration of a benefit to a third person constitutes sufficient consideration") (citing *Finn v. Heritage Bank & Trust Co.*, 178 Ill. App. 3d 609, 612 (1989)); see also *Carter,* 2012 IL 113204, ¶ 23, and *Marriage of Tabassum*, 377 Ill. App. 3d at 770 (consideration is bargained-for exchange of promise or performance benefitting one party or causing detriment to the other).

¶ 21    Lokesh's assertions that there was a lack of consideration on Rakesh's part are meritless. For example, in an attempt to circumvent the principles of contract law, Lokesh claims that, because Rakesh was not a party to the *qui tam* action, he was "removed from the purview of the FCA" and had no claim against Sheth and, thus, there was "no consideration Rakesh would be providing to Lokesh." While we struggle with this logic, it seems as if Lokesh insists that because Rakesh was not a named relator in the federal *qui tam* action, he could not ever bargain for a portion of a potential recovery in that suit. However, whatever the provisions of the FCA, they are irrelevant to the contract at issue. Indeed, the FCA states that "a person may bring a civil action for a violation of section 3729 for the person and for the United States Government" (31 U.S.C. § 3730(b)(1) (2012)), and prescribes the rights and obligations of the relators who bring that action (31 U.S.C. § 3730(c), (d) (2012)). The FCA further provides that if the government decides to intervene in the *qui tam* action, the relators shall receive "at least 15 percent but not more than 25 percent of the proceeds *** or settlement." 31 U.S.C. § 3730(d) (2012). Yet, no provision of the FCA prohibits a named

relator from freely contracting (or assigning, or agreeing, or merely giving, for that matter) a portion of his recovery to someone else (to another named relator or even to a nonparty), just as anyone who receives proceeds from any suit may do. This is exactly what Lokesh and Rakesh did here.

¶ 22    Lokesh also asserts that Rakesh's promise to pay half of his attorney fees and costs was "illusory because Rakesh did not actually promise to do anything," again demonstrating a lack of consideration. As Lokesh explains, because the contract provided compensation to Potter on a contingent basis, and because these fees were to be paid from whatever sum was recovered in the *qui tam* action–a sum that belonged solely to him as the named relator, Rakesh had no "stand-alone right to recovery" and, thus, never had any obligation to pay the costs related to the suit. However, as we noted earlier, Rakesh's actions dispute Lokesh's assertions. That is, and again as Lokesh himself admitted, Rakesh performed to his detriment here by, at the very least, reviewing and discussing the matter with Lokesh, offering to find Lokesh an attorney, finding Potter, meeting with her and providing the documents and materials she need to initiate the *qui tam* action. While Lokesh refutes that Rakesh did anything more here, the fact remains that he has never denied that Rakesh was, at the very least, involved in this initial manner in the *qui tam* suit and, thus, provided consideration for their agreement to share the recovery from it. Furthermore, and again as we noted earlier, Rakesh's promise to share equally in the costs of the *qui tam* action directly contradicts any claim by Lokesh that his promises under the contract were "illusory." See, *e.g.*, *Palmetto Leasing*, 235 Ill. App. 3d at 989 (consideration includes promise of benefit to third person) (citing *Finn*, 178 Ill. App. 3d at 612).

¶ 23  Ultimately here, the provision of the contract at issue stating that Lokesh and Rakesh "will equally share in the relators' share and relators' costs" of the *qui tam* action was plain and unambiguous: the brothers intended, and agreed, to share equally in any obligation, and in any recovery, arising from that cause. Lokesh and Rakesh, both educated and sophisticated doctors, entered into this contract freely and without any contention of fraud or duress. They discussed it between themselves and then with Potter after twice meeting with her, signed the contract, and lived according to it throughout the entire *qui tam* litigation, which spanned almost eight years, until three days before the $1.3 million recovery was scheduled to be distributed. Rakesh aided Lokesh in initiating the *qui tam* action, and Potter succeeded in obtaining a recovery for her clients. Based on all this, we find, as the trial court did, that there was consideration to support both the legal services contract between the parties and the agreement between Lokesh and Rakesh to equally share in the recovery obtained and, thus, that these were legally valid and enforceable.

¶ 24  Lokesh's second, and final, contention of error on direct appeal is that the trial court erred in entering judgment on the pleadings in favor of Rakesh and Potter and against him because it improperly concluded that the contract was not violative of the Rules. Lokesh asserts that there are "issue[s] of material fact" regarding both whether the contract was unenforceable because it constituted a referral or fee sharing agreement between a lawyer (Potter) and a nonlawyer (Rakesh), and whether the contract was unenforceable because it was the basis of a conflict of interest for Potter as she concurrently represented Lokesh and Rakesh pursuant to it. However, taking each assertion in turn, we, again, disagree.

¶ 25  As we noted earlier, whether a contract is unenforceable as violative of public policy is a question of law. See *In re Marriage of Newton*, 2011 IL App (1st) 090683, ¶ 39 (quoting

*Holstein v. Grossman*, 246 Ill. App. 3d 719, 726 (1993)). Courts will not enforce any agreement that violates public policy. See *Newton*, 2011 IL App (1st) 090683, ¶ 39. However, at the same time, and in light of the fact that courts strongly favor the freedom of parties to contract (see *Saba Software*, 2014 IL App (1st) 132381, ¶ 60), the test of whether public policy has been violated within a contract is a stringent one. See *Holstein*, 246 Ill. App. 3d at 726. Under this test, courts will declare a contract unenforceable as violative of public policy only when it expressly contravenes the law or a known public policy of our state. See *Newton*, 2011 IL App (1st) 090683, ¶ 39 (citing *Holstein*, 246 Ill. App. 3d at 726). This would include a contravention of our rules of professional conduct. See *Newton*, 2011 IL App (1st) 090683, ¶ 39; *Holstein*, 246 Ill. App. 3d at 726 (our "public policy" lies in our constitution, judicial decisions and statutes, which includes our rules of conduct, as they have the force of law).

¶ 26    Lokesh is correct that, under Illinois law, agreements to split fees between a lawyer and a nonlawyer are generally against public policy. See *In re Marriage of Steinberg*, 302 Ill. App. 3d 845, 857 (1998). This is embodied in Rule 5.4, which states that a lawyer "shall not share legal fees with a nonlawyer," nor shall she "permit a person who recommends, employs, or pays [her] to render legal services for another to direct or regulate [her] professional judgment in rendering such legal services." Ill. R. Prof. Conduct (2010) R. 5.4(a), (c) (eff. Jan. 1, 2010). The purpose for this policy, and for Rule 5.4, is to prevent an attorney from being tempted to devote less time and attention to those clients whose fees she must share, as well as to prevent a layperson who might have an ulterior motive from recommending a certain attorney based on that layperson's own financial interest rather than the attorney's

skill and credentials. See *Steinberg*, 302 Ill. App. 3d at 857 (citing *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 343 (1989)).

¶ 27        Contrary to Lokesh's insistence, however, those concerns, and Rule 5.4, are completely inapplicable to the instant cause. This is because, as the trial court found, there is no question that the division of monies contemplated and executed between the parties here in no way involved the "sharing" of Potter's fee.

¶ 28        The contract at issue in this cause plainly stated that Lokesh and Rakesh agree to pay Potter her attorney fee for her services in bringing the *qui tam* action. The contract explicitly described that her fee, which was to amount to 40% of any award obtained in that suit, would be paid first from the final proceeds, and that the remainder of the award would then be divided between the brothers. Nowhere does the contract state that any portion of Potter's fee would somehow pass to Rakesh for either his recommendation that Lokesh hire her nor for any "work" he did in relation to the *qui tam* action. Rather, the contract made clear that Potter's fee was to be entirely separate and apart from any agreement Lokesh and Rakesh made with respect to how they would divide the remainder of the *qui tam* recovery. However they chose to do so, their shares of the recovery would come from the remainder and not from the Potter's 40% fee. Potter was to be compensated first, off the top and independent from whatever was left over, and she did not agree to share her fee with anyone. Instead, the final division between the brothers was agreed to by them, as would any two clients who agree to share a recovery after they have paid their attorney her fee. This is the only reasonable, practicable and rational way to read the contract at issue. There is no question of material fact raised here that even remotely hints at fee sharing between Potter and Rakesh and, without more, we cannot find, as Lokesh would have us, that this occurred.

¶ 29         In addition to the maligned financial motivation Lokesh attributes to Rakesh in recommending Potter, which we have just demonstrated via the very facts of this cause is a red herring, Lokesh further insists that the contract also violated Rule 5.5 in that it sanctioned the unauthorized practice of law. See Ill. R. Prof. Conduct (2010) R. 5.5 (eff. Jan. 1, 2010) (a lawyer shall not practice in a jurisdiction in violation of its rules and will not "assist another in doing so"). In an about-face, Lokesh, who throughout this litigation has essentially refuted anything more than the mere initial involvement by Rakesh in assisting him to find an attorney, now argues that Potter improperly assisted Rakesh, a nonlawyer in this instance, in "practicing law." He cites Rakesh's investigation and research into the underlying matter, his provision to Potter of the legal conclusion that Sheth committed billing fraud, and his continued assistance to, and influence over, Potter throughout the entire *qui tam* action. This, however, is a mischaracterization of the record before us. Rakesh stated in his complaint, and Potter corroborated, that all Rakesh did in relation to the *qui tam* action was, first, review and analyze the billing documentation Lokesh gave him when Lokesh approached him initially to obtain his opinion; second, recommend to Lokesh that he speak to an attorney; third, upon Lokesh's agreement, seek out qualified counsel; and fourth, provide Potter's name to Lokesh. Then, and only after Lokesh agreed, Rakesh prepared and organized the documentation, brought it to Potter's office (as Lokesh could not be present), and the three had an initial meeting together (with Lokesh on the telephone). That meeting ended not with Rakesh spearheading a lawsuit but, rather, with Potter telling the brothers that she needed some time to examine the documentation on her own to determine whether a viable cause of action could stand and whether she would choose to pursue it as their counsel. In fact, it was not until the parties meet in person for a second time that Potter decided to take the case.

And, as Rakesh and Potter explain, Rakesh's assistance following Potter's decision extended only to his provision of additional information and materials she needed to proceed with the case. Accordingly, not only did the bulk of Rakesh's work on the *qui tam* action take place before Potter took the case, but Potter also clearly decided to take, and pursued, that action independent of Rakesh.

¶ 30    Lokesh cites several legal sources in support of his claims that the contract at issue resulted in fee sharing and the unauthorized practice of law. Briefly, these include New York State Bar Association Committee on Professional Ethics Formal Op. 698 (Jan. 23, 1998), *Polo v. Gotchel*, 542 A.2d 947 (N.J. Super. Ct. Law Div. 1987), *Dupree v. Malpractice Research, Inc.*, 445 N.W.2d 498 (Mich. Ct. App. 1989), and *In re Quintana*, 724 P.2d 220 (N.M. 1986), which address fee sharing; and *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353 (1997), *In re Discipio*, 163 Ill. 2d 515 (1994), *Infante v. Gottesman*, 558 A.2d 1338 (N.J. App. 1989), and Illinois State Bar Association Op. 94-8 (Sept. 1994), 92-20 (Mar. 26, 1993), which address the unauthorized practice of law. However, the great majority of these foreign opinions provide merely advisory, and nonbinding, commentaries that have nothing to do with Illinois law. And, more significantly, the situations presented in the cases cited by Lokesh are wholly distinguishable from the instant cause. That is, those dealing with fee sharing all present situations where there is an express agreement or contractual relationship between licensed, practicing attorneys and nonlawyers, such as paralegals, disbarred attorneys, consulting service organizations and investigative companies, to specifically share fees the attorneys obtained from their clients' judgments. See, *e.g.*, *Dupree*, 445 N.W.2d 498 (improper contract between attorney and organization which agreed to provide expert testimony and trial advice in exchange for

18

contingency fee); *Infante*, 558 A.2d 1338 (improper partnership agreement between attorney and claims investigator); *Quintana*, 724 P.2d 220 (improper agreement between attorney and investigator); *Polo*, 542 A.2d 947 (improper agreement between attorney and medical-legal consulting service for percent of contingent fee). And, those dealing with the unauthorized practice of law all present situations where a nonlawyer actively, and improperly, participated in the preparation or prosecution of a cause of action as would a licensed attorney. See, *e.g.*, *First National Bank*, 179 Ill. 2d 353 (nonlawyer procured and prepared witnesses for cause); *Dupree*, 445 N.W.2d 498 (same); *Polo*, 542 A.2d 947 (attorney sent nonlawyer records to review and evaluate with respect to merits of lawsuit); *Discipio*, 163 Ill. 2d 515 (disbarred attorney prepared documents requiring degree of legal skill and knowledge on behalf of attorney in exchange for half of the fees paid); *Infante*, 558 A.2d 1338 (same, as between attorney and nonlawyer claims investigator). As there was neither any sort of agreement, express or implied, in the attorney-client contract at issue between attorney Potter and nonlawyer-client Rakesh, nor any active participation by nonlawyer-client Rakesh in attorney Potter's preparation and prosecution of the *qui tam* action, these materials cited by Lokesh discussing inappropriate fee sharing and the unauthorized practice of law are entirely irrelevant to the instant cause.

¶ 31    Turning to Lokesh's next claim that an "issue of material fact" exists as to whether Potter's concurrent representation of the brothers created a conflict of interest between the parties so as to render the contract unenforceable, we again find no merit. Lokesh asserts that the structure of Potter's representation under the contract of both him and Rakesh violated Rule 1.7 regarding an attorney's loyalty to her client and her independent judgment in pursuing an action on her client's behalf. See Ill. R. Prof. Conduct (2010) R. 1.7 (eff. Jan. 1,

2010). Again turning to the FCA, he insists that, since he was the only named relator, only he had a right to recovery in the *qui tam* action; Potter had a duty to safeguard his right as his attorney; and, but for her dual representation of him and Rakesh, he would have had an undivided right to the full settlement amount. However, based on the evidence before us, we find that there was no conflict of interest here.

¶ 32    As we noted earlier, courts favor the right of private parties to form and enter into a contract of their own free will and volition, to contemplate its terms, and to negotiate and bargain for its execution. See *Saba Software*, 2014 IL App (1st) 132381, ¶ 60; *Hussein*, 2013 IL App (1st) 121426, ¶ 11. Courts will uphold such a contract and will only declare it void and unenforceable if it violates public policy or is manifestly injurious to the public welfare. See *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 65 (2006). Demonstrating this is a difficult burden on a party seeking to challenge a contract's validity, and courts are reluctant to find a contract unenforceable because of it. See *Mohanty*, 225 Ill. 2d at 64-65; accord *Saba Software*, 2014 IL App (1st) 132381, ¶ 60 (citing *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 129 (2005)).

¶ 33    No conflict of interest arose between Potter's concurrent representation of Lokesh and Rakesh and the division of the recovery from the *qui tam* action, for several reasons. First, the contract between the parties did not retain Potter to advise the brothers with respect to dividing or distributing the remainder, after payment of her fee, of the *qui tam* recovery. Rather, the clear and explicit purpose of the contract, as we have discussed at length, was an attorney-client retainer agreement: Lokesh and Rakesh, the named clients, hired Potter, an attorney, to represent both of them in the *qui tam* action. As the contract states, the brothers retained and employed Potter to represent them "in the matter of claims against Sushil

20

Sheth." And, the contract stated that Potter was to be compensated for this work, if it would result in a recovery, from the *qui tam* litigation. The contract did not call for Potter to represent either Lokesh or Rakesh, or both of them, in deciding how, or if, to divide their portion of the recovery between each other, and the contract did not agree to compensate Potter for such advice or work or from the brothers' portions of the *qui tam* recovery. From this, there can be no conflict of interest between Potter and the brothers regarding an agreement they formed irrespective of her representation of them in the *qui tam* action.

¶ 34    Moreover, Lokesh's citation to Rule 1.7 does not support the inference that there was a question of a conflict of interest from the brother's retention of Potter to bring the *qui tam* action. Rule 1.7 states that an attorney is not to represent a client "if the representation involves a concurrent conflict of interest," which exists when "the representation of one client will be directly adverse to another client" or when "there is a significant risk that the representation" of more than one client "will be materially limited" by the lawyer's responsibilities to another client, to a former client, to a third person or to her own personal interests. Ill. R. Prof. Conduct (2010) R. 1.7 (eff. Jan. 1, 2010). There must be a substantial basis for believing that an actual conflict of interest exists in order to disqualify the attorney from her representation of multiple clients, not merely a potential or speculated one. See *In re Possession & Control of the Commissioner of Banks & Real Estate*, 327 Ill. App. 3d 441, 478 (2001). Critically, Rule 1.7, and its concerns regarding conflict of interest, apply when an attorney is representing one client in a lawsuit against another individual who is also a client of that attorney, thereby resulting in the same attorney being on both sides of the lawsuit. See *In re Commissioner*, 327 Ill. App. 3d at 478.

¶ 35    In the instant cause, there was no conflict of interest in Potter's concurrent representation of both Lokesh and Rakesh. This is because, as we have already pointed out, Lokesh and Rakesh were on the same side of the *qui tam* action and of the contract. Potter was not representing parties on different sides of the same lawsuit. To the contrary, and as the contract itself makes clear, she was representing both Lokesh and Rakesh, who were both on the same side of the same lawsuit–the *qui tam* action. Although the parties thought it best that only Lokesh be a named relator in that suit, the parties agreed to pursue the cause together. Lokesh and Rakesh, both of whom the contract specifically named as Potter's clients, agreed to hire her to represent them together in the *qui tam* action; as a separate agreement, the brothers agreed they would divide their portion of the recovery in half. Thus, as for Potter's role, she entered into the contract to represent both the brothers as against Sheth in the *qui tam* action, nothing more.

¶ 36    It is clear, then, that there could be no conflict of interest in Potter's representation of Lokesh and Rakesh in the *qui tam* action because the aim and scope of that representation was the same for all the parties involved: to obtain the maximum recovery possible in the claim against Sheth. For the duration of Potter's representation, Lokesh and Rakesh, and Potter too, shared the same interest. That Potter represented both brothers, rather than solely one or the other, did not change her strategy, interest or responsibility to either of them in the *qui tam* action. Rather, a conflict of interest arose only when Lokesh reneged on his agreement to share the remainder of the recovery with Rakesh, which occurred almost eight years after the formation of the contract at issue and only three days before the settlement was scheduled to be released to the parties–all because Lokesh no longer wanted to honor the

contract. It was at this point that the parties involved each obtained their own separate counsel.

¶ 37    Just as the materials Lokesh cited in his argument regarding his assertions of fee sharing and the unauthorized practice of law, those he points to here are not only nonbinding, but also wholly distinguishable. For example, *Swift v. Choe*, 674 N.Y.S.2d 17 (N.Y. App. Div. 1998), and *In re Estate of Watson*, 557 N.W.2d 38 (Neb. Ct. App. 1996), are from foreign jurisdictions and detail that conflicts of interest were found because the attorneys therein represented clients on opposite sides of real estate transactions. *Newton*, 2011 IL App (1st) 090683, and *King v. King*, 52 Ill. App. 3d 749 (1977), though from our state, both involve divorce cases where the attorneys, at one point, represented or at least consulted with both the husbands and the wives on different sides of their causes, thereby creating conflicts of interest. And, *Frederick v. Zeigler Coal Co.*, 56 Ill. App. 3d 888 (1978), which Lokesh discusses at length, also fails to support his argument. *Frederick* involved two attorneys and their agreement to divide fees in a decedent's claim under the Workmen's Compensation Act and the Structural Work Act; however, one attorney represented the decedent's widow and her son but then filed a complaint purporting to also represent the decedent's children by another marriage, while the other attorney was hired to represent the decedent's children by his first marriage. Accordingly, the *Frederick* court found a potential, and perhaps very real, conflict between the decedent's widow and various children in relation to the recovery at issue. See *Frederick*, 56 Ill. App. 3d at 892-93. The instant cause is nothing like *Frederick*'s shuffling of clients, and we find no conflict of interest.[4]

---

[4] Interestingly, Lokesh also discusses the foreign cause of *In re Guardianship of Lauderdale*, 549 P.2d 42 (Wash. Ct. App. 1976), which actually supports a finding of no conflict here. That is, the court in *Lauderdale* found no conflict

¶ 38    Even were we to accept Lokesh's argument that a conflict of interest existed, which we do not, such a finding still would not necessarily invalidate the contract at issue. Rule 1.7, in addition to describing what a conflict is, further states:

"Notwithstanding the existence of a concurrent conflict of interest ***, a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding ***; and

(4) each affected client gives informed consent." Ill. R. Prof. Conduct (2010) R. 1.7(b) (eff. Jan. 1, 2010).

Thus, even if a conflict of interest in concurrent representation is found, it does not automatically invalidate that representation. See *Premier Networks, Inc. v. Stadheim & Grear, Ltd.*, 395 Ill. App. 3d 629, 634 (2009) ("[i]ndeed, even when it is established that a fee agreement violates rules of professional conduct, that fact alone does not invalidate the

of interest arose in an attorney's representation of multiple minors involved in a wrongful death action. It was only when the minors' guardian *ad litem* disagreed, not with the settlement amount secured by the attorney, but with the proposed apportionment of the resulting award to each different child, that the court found a conflict arose. See *Lauderdale*, 549 P.2d at 45-46. Just as in *Lauderdale*, there was no conflict of interest in Potter's representation of both brothers under the contract and in securing the settlement pursuant to it, until Lokesh disputed the settlement's apportionment, at which point Potter and Rakesh retained separate counsel.

agreement") (citing *American Home Assurance Co. v. Golomb*, 239 Ill. App. 3d 37, 42 (1992)).

¶ 39        Contrary to Lokesh's insistence, that would certainly be the case here, were a conflict of interest assumed. Potter evaluated the brothers' claim of billing fraud against Sheth and believed she could competently and diligently pursue for both of them a *qui tam* action. The parties formed a contract for this representation which named both brothers as clients and Potter as the attorney of record. This representation was not prohibited by any law. As we have discussed, the FCA did not prohibit Lokesh from assigning or promising to give his portion of the recovery from the *qui tam* to Rakesh or anyone else. In fact, the FCA allows for multiple relators in a single cause; here, the parties discussed and agreed, for whatever reason, that, for the particular cause against Sheth, it was best that the *qui tam* action proceed with only one named relator, Lokesh. Yet, this did not prevent Lokesh, and he does not point to anything that would have prevented him, from agreeing to share his recovery, if any, with Rakesh, regardless of his status as a relator or nonrelator. Lokesh unquestionably gave his consent to this contractual, representative relationship. As Lokesh admitted, he went to Rakesh initially, revealing to him his claims of Sheth's billing fraud and showing him the relevant documentation, even before retaining Potter. And, undeniably, Lokesh signed the contract creating the relationship between him and Rakesh as clients and Potter as their attorney, lived under it for almost eight years, and reaped the benefits of its execution in his favor to the tune of hundreds of thousands of dollars in settlement money paid to him. Based on these circumstances, even if a conflict of interest were found to have existed in Potter's concurrent representation of both Lokesh and Rakesh in the *qui tam* action, the contract between these parties for this representation, as formed and executed, would still be valid.

See *Premier Networks*, 395 Ill. App. 3d at 634-35; *Partee v. Compton*, 273 Ill. App. 3d 721, 724 (1995) (even though trial court found that contract for representation between lawyer and two clients violated professional rules of conduct, reviewing court found that contract was nonetheless enforceable because clients entered into it knowingly, their case settled with a sum distributed in their favor, and the contract was executed; to invalidate the contract "would permit [the] defendants to receive the benefits of the contract and endorse their refusal to pay their attorney his fee").

¶ 40      In sum, we find that the trial court did not err in its determination that the contract at issue here is valid and enforceable. Its plain and unambiguous language makes clear that the parties intended that Lokesh and Rakesh, as clients, hire Potter, as their attorney, to represent them in a *qui tam* action against Sheth in exchange for her fee of 40% of any recovery obtained, and the remainder of the recovery would be split equally between the brothers. Potter provided consideration for the contract in the form of her services and the recovery she obtained. Rakesh, who was not required to provide any consideration under these circumstances, nonetheless exchanged his services of obtaining Potter and preparing and organizing documents given to him by Lokesh for his bargained-for promise under the contract. This was not an instance of fee sharing or the unauthorized practice of law, nor did this relationship amount to a conflict of interest. All the parties to this contract, each a sophisticated, educated and licensed professional, no less, entered into it freely, worked under it to achieve the same goal of maximum recovery in the *qui tam* action, and lived pursuant to its terms throughout that litigation and to the contract's execution. Lokesh has failed to provide us with any merited basis, and we find none, upon which to declare this

contract invalid. Accordingly, we affirm the judgment of the trial court on direct appeal finding the contract at issue to be valid and enforceable.

¶ 41                                  II. Rakesh's and Potter's Cross-Appeals

¶ 42        The second part of this cause involves Rakesh's and Potter's cross-appeals. While they both argue the matter in their own separate briefs, their arguments are identical. They contend that the trial court erred in denying their respective requests for an award of prejudgment interest, asserting that such an award was statutorily mandated pursuant to the Illinois Interest Act (Interest Act) (815 ILCS 205/2 (West 2014)), because the contract at issue was an instrument of writing with easily calculable interest and, alternatively, because Lokesh displayed unreasonable and vexatious conduct that delayed payment. Rakesh and Potter ask that we reverse the trial court's denial and award prejudgment interest in their favor, with Potter seeking interest on her 40% fee from the total $1,355,569.86 *qui tam* recovery and with Rakesh seeking interest on his one-half of the remainder as paid out to him pursuant to the contract. We agree.

¶ 43        Before we turn to the arguments presented by the parties, we revisit the record with respect to this portion of the cause. As noted earlier, upon Rakesh's and Potter's motions for judgment on the pleadings, which included requests for prejudgment interest (as had their respective pleadings), the trial court held a hearing. Though the majority of this hearing focused on the validity and enforceability of the contract at issue, the court, after resolving that issue in Rakesh's and Potter's favors, also addressed, albeit briefly, their requests for prejudgment interest. After hearing the parties' arguments on this and reading aloud a portion of the Interest Act, the court commented that while it agreed with Rakesh and Potter and "believe[d] that Lokesh's objections were what held up the distribution" of the *qui tam*

recovery, it did not believe awarding prejudgment interest was altogether proper because it was not as if Lokesh had been "holding onto" the money; rather, it had been sitting in Potter's client trust account. And, although the court acknowledged Potter "had no choice but to" leave the money in that account untouchable and undistributable, it felt this was "not a typical pre[]judgment interest case" on which to issue such an award.

¶ 44    The parties raise two threshold matters of concern. First, Lokesh insists that Rakesh and Potter have waived or forfeited any issue pertaining to prejudgment interest on review because they never sufficiently raised it below and/or failed to argue it and the bases they now raise of statutory mandates and vexatious conduct, for the trial court's full consideration. However, this is a complete mischaracterization of the record. As we have just demonstrated by our review of its colloquy, the trial court clearly and fully addressed the matter of prejudgment interest on both bases raised by Rakesh and Potter. Moreover, waiver and forfeiture are further belied by the record in this cause. As the pleadings make clear, Rakesh and Potter sought prejudgment interest based on the statutory requirements of the Interest Act and Lokesh's conduct from the inception of their lawsuits. Rakesh raised the issue in his initial complaint, his answer to Potter's counterclaim, his motion for default, his motion for judgment on the pleadings and his reply in support of his motion for judgment on the pleadings. Similarly, Potter raised the issue in her answer and counterclaim (her pleading), her motion for judgment on the pleadings and her reply in support of her motion for judgment on the pleadings. Clearly, this record is in direct contradiction to Lokesh's claim that Rakesh and Potter only raised the issue of prejudgment interest for the first time in their replies to their motions for judgment on the pleadings. Therefore, we wholly fail to find any merit in Lokesh's attempt at a waiver/forfeiture argument here.

¶ 45    The second threshold matter we wish to address is the applicable standard of review. Potter acknowledges that while, generally, an abuse of discretion or manifest weight of the evidence standard applies to the review of a trial court's ruling on a request for prejudgment interest, thereby giving deference to that court's decision, a *de novo* standard should apply to the instant cause, for several reasons. First, Potter notes that the Interest Act mandates prejudgment interest as a matter of right when a creditor seeks payment of a fixed sum on an instrument of writing. See 815 ILCS 205/2 (West 2014). She then cites *Milligan v. Gorman*, 348 Ill. App. 3d 411, 415-16 (2004), wherein the reviewing court used a *de novo* standard in a prejudgment interest case involving an instrument of writing under the Interest Act, and *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 672 (2004), wherein the reviewing court used a *de novo* standard in a prejudgment interest case based on unreasonable and vexatious delay in payment. Potter further explains that when an instrument of writing is involved and there are no factual disputes to be determined but only matters of law, the right to prejudgment interest becomes a matter of law and, thus, the applicable standard is *de novo*. See *Kruse v. Kuntz*, 288 Ill. App. 3d 431, 437 (1996); see also *Raintree Homes, Inc. v. Village of Long Grove*, 389 Ill. App. 3d 836, 871-72 (2009). And, Potter reminds this court that the trial court's ruling denying prejudgment interest was, just as its ruling regarding the validity and enforceability of the contract, based on motions for judgment on the pleadings which, as we discussed earlier, are reviewed *de novo*. See *Gillen*, 215 Ill. 2d at 385; *Pekin Insurance*, 329 Ill. App. 3d at 49. For their part, Lokesh and Rakesh do not tackle the question of the applicable standard of review in this cross-appeal; Lokesh, of course, only briefly restates the abuse of discretion standard generally used in prejudgment interest claims, and Rakesh simply mentions that generalized standard in presenting his arguments.

¶ 46 We believe, however, that Potter raises several interesting points here meriting *de novo*, rather than the general abuse of discretion, review. As we will discuss in more detail below, the cases she cites, including *Andrews* and *Kruse*, are directly on point, and *Milligan*, particularly, speaks clearly on this dilemma. There, our court acknowledged that we generally accord deference to a trial court's decision on a request for interest on a judgment. See *Milligan*, 348 Ill. App. 3d at 415. However, we also examined the Interest Act and noted that statute mandates prejudgment interest as a matter of right in certain situations, such as when a fixed sum and an instrument of writing are involved. See *Milligan*, 348 Ill. App. 3d at 416. In such an instance, that is, when the facts show that there is no dispute as to the existence of a fixed debt based on a written instrument, reviewing courts will not defer to a trial court's denial of interest but will, instead, employ *de novo* review since only issues of law are involved. See *Milligan*, 348 Ill. App. 3d at 416; accord *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 98 (the Interest Act mandates prejudgment interest as a matter of right in certain situations and, thus, *de novo* review is required in those). In addition, Potter is absolutely correct that the trial court here decided the issue of prejudgment interest upon her and Rakesh's motions for judgment on the pleadings–a decision pursuant to which we are to employ *de novo* review. See *Gillen*, 215 Ill. 2d at 385; *Pekin Insurance*, 329 Ill. App. 3d at 49. Based on all this, we agree with Potter.

¶ 47 Accordingly, we review the trial court's denial of Potter's and Rakesh's requests for prejudgment interest on the sums owed them from the *qui tam* recovery as per the valid and enforceable contract entered into by the parties *de novo*. However, even if the abuse of discretion standard was applicable here, our determination of error on the part of the trial court in denying prejudgment interest, as discussed below, would still stand.

¶ 48        Prejudgment interest focuses on the principle of fairness and the concept of fully compensating an injured party for a monetary loss.  See *Milligan*, 348 Ill. App. 3d at 416. " 'If a creditor is denied payment of a sum rightfully his, he loses not only that sum but the right to use it.  In our society the use of money is worth money.' " *Milligan*, 348 Ill. App. 3d at 416 (quoting *Haas v. Cravatta*, 71 Ill. App. 3d 325, 332 (1979)); see also *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989) (prejudgment interest compensates for wrongful withholding of money owed and loss of ability to use it).  Prejudgment interest can be awarded pursuant to statute, as agreed to by the parties or otherwise warranted by equitable considerations.  See *Progressive Land Developers, Inc. v. Exchange National Bank of Chicago*, 266 Ill. App. 3d 934, 945 (1994) (citing *In re Estate of Wernick*, 127 Ill. 2d 61, 86-87 (1989)).

¶ 49        Statutorily, the Interest Act states that "[c]reditors shall be allowed to receive" 5% per annum as prejudgment interest on money due and owing to them in any one of several different situations.  815 ILCS 205/2 (West 2014).  Relevant to the instant cause, this would include "for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing," and "on money withheld by an unreasonable and vexatious delay of payment."  815 ILCS 205/2 (West 2014).  Potter and Rakesh petitioned the trial court for prejudgment interest pursuant to both of these avenues for recovery of prejudgment interest under the Interest Act and have argued both before us on appeal.  We therefore will examine each contention.

¶ 50        With respect to the first ground, again, the Interest Act specifies that creditors can receive prejudgment interest on moneys due based on an "instrument of writing."  815 ILCS 205/2 (West 2014).  This includes, specifically, contingency fee agreements such as the contract at

issue in this cause as signed by the parties. See *New Hampshire Insurance Co. v. Hanover Insurance Co.*, 296 Ill. App. 3d 701, 708 (1998) (citing *Krantz v. Chessick*, 282 Ill. App. 3d 322, 327-28 (1996)). When an instrument of writing establishes an amount due and the time for payment, the creditor has a right to interest and, as long as the amount due pursuant to that instrument of writing was liquidated or is easily computed, prejudgment interest is to be awarded. See *Milligan*, 348 Ill. App. 3d at 416; *New Hampshire*, 296 Ill. App. 3d at 709. And, if the amount is determinable, "interest can be awarded on money payable even when the claimed right and the amount due require legal ascertainment" and the parties disagree as to their liability. *New Hampshire*, 296 Ill. App. 3d at 709. Accordingly, not even a good-faith dispute as to which party is responsible for payment, were one adequately raised, would preclude the recovery of prejudgment interest on money due under an instrument of writing. See *New Hampshire*, 296 Ill. App. 3d at 709. Under the Interest Act, if these qualifications are met, prejudgment interest is statutorily mandated. See 815 ILCS 205/2 (West 2014); accord *Milligan*, 348 Ill. App. 3d at 416; *New Hampshire*, 296 Ill. App. 3d at 709.

¶ 51        In the instant cause, it is undeniable that there is an instrument of writing that qualifies under the Interest Act's requirements for prejudgment interest based on written instruments and that directly governs the creditor-debtor relationship between the parties, namely, the contingency fee agreement entitled "Contract for Legal Services" as signed by Potter, Rakesh and Lokesh. Pursuant to that contract, which the trial court found to be valid and enforceable, the parties agreed that Potter would bring the *qui tam* action and, if a recovery were had, she would receive 40% of that recovery as her fee and the brothers would equally split the remainder. In September 2013, when the federal government announced the settlement in the *qui tam* action, its $1,355,569.86 amount, and that it would be disbursed on

September 19, 2013, the parties' rights to that money accrued; all conditions of the contract had been met, the contingency had been fulfilled, and the only thing left to do was to pay out the fixed sum to each party as calculated pursuant to the terms of the contract they had signed long ago. Accordingly, the amounts due to Potter, Rakesh and Lokesh had been established by the contract, they were easily computed the moment the federal government revealed the amount of the settlement in the *qui tam* action ($1,355,569.86, with 40% to Potter, then the remaining 60% to be equally split between Rakesh and Lokesh), and the time for payment had come as that cause had been completely resolved and the disbursement date was announced (September 19, 2013). Clearly, all the statutory requirements of the Interest Act have been met for an award of prejudgment interest based on this instrument in writing.

¶ 52     The trial court here, however, believed prejudgment interest was not mandated under the statute. Instead, in its brief treatment of the prejudgment interest issue, it read outloud a portion of the Interest Act but rejected Potter's and Rakesh's arguments based on the instrument in writing concept, stating that while it understood what happened and that Potter and Rakesh had been denied the use of their rightful portions of the *qui tam* recovery under the contract, it did not want to punish Lokesh because "[h]e was not holding onto" the money. This reasoning was incorrect. With respect to money due and owning based on an instrument in writing, as this situation clearly presents, the Interest Act does not take into consideration whether the debtor is in physical possession of that money. Instead, it looks only to, as we have noted, whether it has been established that an instrument in writing exists, that instrument establishes an amount due and the time for payment, and that amount due was liquidated or is easily computed. And, any dispute, even one based on good-faith, raised by Lokesh would be irrelevant. Lokesh's conduct in objecting to the distribution days

before it was scheduled to be made had the same detrimental effect on Rakesh and Potter as if he had obtained physical possession of the settlement funds and refused to remit them pursuant to the parties' contract. Thus, the trial court used improper reasoning as the basis for its denial of prejudgment interest in contradiction of the applicable statute. As per the mandates of the Interest Act, Potter and Rakesh were statutorily entitled to prejudgment interest on their portions of the *qui tam* recovery from September 19, 2013 (the date of distribution of the money by the federal government) to November 19, 2014 (the date of the trial court's decision) pursuant to the instrument in writing here.

¶ 53    Alternatively, were anyone to disagree with our evaluation, there is another basis for the reversal of the trial court's denial of prejudgment interest in this cause. This involves, as raised and argued by Potter and Rakesh throughout this litigation, Lokesh's conduct. In addition to mandating prejudgment interest on an instrument in writing as detailed above, the Interest Act also permits an award of prejudgment interest on money "withheld by an unreasonable and vexatious delay of payment." 815 ILCS 205/2 (West 2014). To prove such a delay, it must be demonstrated that the debtor " 'had thrown obstacles in the way of collection or by some circumvention or management of his own had induced the collector to delay taking proceedings to collect the debt longer than he would have otherwise done.' " *In re Estate of Feinberg*, 2014 IL App (1st) 112219, ¶ 120 (quoting *Hamilton v. American Gage & Machine Corp.*, 35 Ill. App. 3d 845, 853 (1976)).

¶ 54    In the instant cause, when the trial court explicitly stated that it "believe[d] that Lokesh's objections were what held up the distribution," it certifiably admitted that it was Lokesh who created obstacles to prevent Potter and Rakesh from collecting the money rightfully due and owing to them under the contract. And, as the record demonstrates, this is true. The parties,

34

all educated and sophisticated professionals, freely, knowingly and voluntarily entered into the contract on March 12, 2006. They decided to pursue the *qui tam* action against Sheth and agreed how, if it were to result in intervention by the federal government and in recovery, to divide that recovery. The parties operated under this contract for the next 7½ years. During that time, the federal government did find merit in their cause and a recovery was had, one that was quite substantial. After the recovery was announced, and with the contract firmly in place, there was nothing left for the parties to argue or even contemplate; no more contingencies existed and everyone knew exactly to what they were entitled; they even knew when the distribution was to take place. However, after all that time, and less than three days before the scheduled distribution, having never objected to or questioned any provision of the contract, Lokesh obtained new counsel and sent a demand letter to Potter disputing the contract's agreed-to distribution. As even the trial court acknowledged, this forced Potter to place the entire *qui tam* recovery into her client trust account, thereby freezing the money and preventing her and Rakesh's access to it–access they rightfully had pursuant to the contract. Clearly, Lokesh, by his own design, created an obstacle in the way of Potter and Rakesh's collection of their due and owing monies.

¶ 55     In addition to this, the next 14 months saw a multitude of unnecessary filings on Lokesh's part that continued to unreasonably delay the resolution of this matter. Once Rakesh brought his contract action to state court, and well after the *qui tam* action had terminated, Lokesh filed a "Motion to Disperse [*sic*] Relator Recovery and for Adjudication of Attorney's Fees" in federal court as part of the *qui tam* cause. When this was rejected, Lokesh attempted to remove the entire cause to federal court, thereby causing more delay. Following the federal court's order officially remanding the cause to state court, Lokesh pursued extensive

discovery even though this cause essentially revolved around only questions of law–to the point that Potter filed a motion to curtail Lokesh's discovery requests, which the trial court granted. Again, Lokesh's actions, this time in attempting to circumvent the proper prosecution of this cause, forced Potter and Rakesh to delay in taking the proceeds of their rightful recovery under the contract.

¶ 56     As its brief colloquy demonstrates, the trial court's reasoning in supporting its denial of prejudgment interest was skewed. The court acknowledged that the purpose of an award of prejudgment interest was to compensate Potter and Rakesh, but it stated that such an award "is also to make sure that the person who has held onto money that now the Court said belongs to [Potter and Rakesh] didn't benefit from holding onto that money." The court's reasoning shows that the basis it used for denying Potter's and Rakesh's requests for prejudgment interest was that Lokesh "didn't hold onto any of that money;" since he "didn't have the benefit of that money," the court did not feel this was "an appropriate case for an award of pre[]judgment interest" and, thus, was not comfortable in issuing an award. This, however, was an improper basis for the trial court's decision. It is irrelevant whether Lokesh actually or physically held onto the money in order to prevent Potter and Rakesh from accessing or using their rightful share, or whether Lokesh himself did or did not have the benefit of the money while Potter and Rakesh were denied its access and use. As we have discussed, the only concerns relevant in determining whether prejudgment interest should be awarded under the Interest Act are whether the debtor created obstacles to the money's collection or circumvented or, by his own accord, induced the collectors to delay in collecting their rightful proceeds longer than they would have done otherwise. See *Estate of*

*Feinberg*, 2014 IL App (1st) 112219, ¶ 120; *Hamilton*, 35 Ill. App. 3d at 853. By the trial court's own admission, Lokesh did so.

¶ 57 Unlike the previous ground discussed above dealing with written instruments, under this ground of unreasonable and vexatious delay, the argument of a good faith dispute could be considered in determining whether prejudgment interest should be awarded. See *Krantz*, 282 Ill. App. 3d at 327. Yet, the only such dispute raised by Lokesh was that "he never withheld money" personally and that Potter "could have distributed the money" when it was deposited by the federal government and pursued a cause of action accordingly. Not only did the trial court "disagree" with Lokesh's recommendation on what Potter should have done, but Lokesh's argument, in great irony, advocates that Potter should have violated the same Rules he has so fervently argued she should have followed in creating the contract at issue in this cause. See Ill. R. Prof. Conduct (2010) R. 1.15(e) (eff. Jan. 1, 2010) (if a lawyer "is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved").

¶ 58 Ultimately, and based on the all the circumstances present in the record, we find that Potter and Rakesh were entitled to an award of prejudgment interest under the Interest Act based on the existence of an instrument in writing and, alternatively, based on Lokesh's unreasonable and vexatious delay of payment on the contract. Therefore, we remand this portion of the cause to the trial court with directions to enter such award based on the amount of the *qui tam* recovery and the division agreed to by the parties in the valid and enforceable contract.

¶ 59                                              CONCLUSION

¶ 60        For all the foregoing reasons, we affirm that portion of the trial court's judgment finding

that the contract at issue in this cause was valid and enforceable; we reverse that portion of

its judgment denying Potter's and Rakesh's requests for prejudgment interest; and we remand

this latter portion of the cause with directions that the trial court calculate and enter an award

for prejudgment interest in accordance with the Interest Act and based on the amount

recovered from the *qui tam* action and the division of that recovery as agreed to by the parties

in the contract.

¶ 61        Affirmed in part; reversed in part; remanded with directions.